Arthur G. Klein, J.
This action in replevin was tried to the court and a jury. Plaintiff sought to recover a painting by Marc Chagall, which she and her husband had left in their apartment in Brussells when they fled in March, 1941, before the oncoming Nazis.
Treated by the Nazis as “ decadent Jewish art ”, the painting was seized by the ‘ ‘ Einsatzstab der Dienststellen des Beichsleiters Bosenberg ” on or about March 31, 1941, and a certification or receipt left, indicating that the painting, among other works of art, had been taken into “ safekeeping.”
The Menzels were among the more fortunate who were able to escape. They settled in the United States and lived here since 1941. Mr. Menzel died in 1960.
Search had been made by Mr. and Mrs. Menzel for the painting ever since the end of the war, but they were unable to locate it, until in 1962, it was discovered in the possession of defendant Albert A. List.
Demand, refusal, and this action followed.
*302 List, a well-known art collector, defending, brought in as third-party defendants the proprietors of the gallery from which he purchased the painting, Klaus G. Peris and Amelia B. Peris, doing business as Peris Galleries. Peris likewise is a well-known art gallery.
Plaintiff in her complaint alleges that she is and at all times since 1932 has been the lawful owner of the painting, entitled “ Le Paysan a L’echelle ” [The Peasant and the Ladder] and has been and now is entitled to immediate possession of the painting.
On or about March 31, 1941, the complaint alleges, the painting was “wrongfully and illegally looted and stolen from her former residence by the Nazi Goering-Bosenberg Group ”; and “ at no time has any compensation been paid for same by the German or Belgian governments or received by plaintiff from any other source ”.
Discovery in November, 1962, and demand and refusal, are then alleged; and plaintiff’s prayer for relief is in the form customary in replevin actions, praying for possession or, in the alternative, for the value, which the complaint alleged to be $25,000.
The answer, denying knowledge or information as to the material allegations of the complaint, set up as an affirmative defense that the cause is barred by the New York Statute of Limitations.
In his third-party complaint, List alleges that he purchased the painting from defendants Peris, whose galleries are located at 1016 Madison Avenue, on or about October 14, 1955, for $4,000; that the painting was entitled “L’echelle de Jacob [Jacob’s Ladder] ”; that in the purchase Peris Galleries warranted and represented that their title was valid and that they were empowered to sell the painting to List.
Admitting that List was a bona fide purchaser for value, and that they warranted title to the painting, the third-party defendants set up as defenses a Statute of Limitations [presumably New York] and that they, too, were bona fide purchasers of the painting in good faith and for value.
As to Mrs. Menzel, the third-party defendants denied she was the owner; denied knowledge or information as to the rest of her complaint and set up as to her, also, a Statute of Limitations and asserted that they were bona fide purchasers for value and in good faith, and without any knowledge or information as to the existence of any defect in title.
*303 It appears from the record that the Menzels bought the painting in 1932 from the collection of Walter Schwarzenberg through Galerie Georges Giroux, in Brussels, and paid for it 3,800 Belgian francs, the equivalent of $150. The painting remained in the Menzels’ Brussels home until they fled in 1941.
The whereabouts of the painting between 1941 and 1955 are unknown.
Peris testified that he bought the painting in July 1955 from Galerie Art Moderne in Paris for $2,800 in French francs.
He further stated that title was not warranted in writing or orally to third-party defendants; that Galerie Art Moderne is one of the leading, most representative, reputable galleries in Paris, as is Peris Galleries in New York; and amongst such galleries the offer of sale of any painting is in and of itself, in the custom of the trade as between galleries, warranty of title. Art galleries of such standing assume, without the necessity of inquiry, that an offer of sale constitutes a representation of authenticity and good title.
The defense also urged before the jury that since the painting was described in the receipt as an oil, but in fact was a gouache, it was not the same painting which the Menzels had left in their apartment.
Likewise, the defendants maintained that the title of the painting having variously been referred to as “ Le paysan a 1’Echelle ” (the peasant and [at] the ladder); “ Nez et Echelle [Nose and Ladder] ”; “ Le Paysan [The Peasant] ”; “ L’echelle sur le Nez [The ladder on the Nose] ”; and “L’echelle de Jacob [Jacob’s Ladder] ”, it could not positively be identified as the same work. In addition, Peris testified that on occasion Chagall prepared two gouaches of the same subject and used only one as the basis for an eventual oil painting. For all of these reasons, Peris urged the jury that the painting which the Menzels left in Brussells was not the painting received in evidence.
The defendants also raised issues, as to Mrs. Menzel’s right to bring this replevin action, in view of Mr. Menzel’s death, since the original purchase was made by him.
The jury by its verdict for the plaintiff has established the identity of the painting, by whatever name, and whatever description; Mrs. Menzel’s unqualified ownership of the painting; that the painting was looted and stolen from her apartment, as alleged in the complaint, and that the painting, or its value, which the jury fixed at $22,500, be awarded to Mrs. Menzel; and that List upon delivery of the painting to Mrs. Menzel recover the $22,500 from Peris Galleries.
*304 The result reached is amply supported by the record, and the motion to set aside the verdict as contrary to the weight of the evidence is denied.
There remain for disposition, on the motion to set aside, numerous questions of law which have been earnestly and forcefully pressed by able counsel for the defense and vigorously opposed by learned counsel for plaintiff.
These include:
(I) the defense of the Statutes of Limitations of New York and Belgium;
(II) the plaintiff having fled Belgium, abandoned everything in her apartment;
(III) the painting was captured by occupying land forces on land and title accordingly passed to the nation prosecuting the war;
(IV) the painting was lawfully requisitioned by German authority, as an occupying power in the prosecution of the law and as confiscation of the property of its nationals;
(V) that the defendants are bona fide purchasers of the painting for value.
In their supplemental brief, the third-party defendants, planting themselves upon Banco Nacional de Cuba v. Sabbatino (376 U. S. 398 [1964]), urge with respect to IV, above, the applicability of the Act of State Doctrine; they assert that this court should not “ assume jurisdiction to determine title as of 1941 to the property seized, requisitioned, confiscated or expropriated by duly authorized German officers from one of its own nationals, blacklisted as an enemy of the State ” because of the “ fortuitous ” circumstance that the property was found here.
The court will treat these grounds seriatim. The resolution of these problems is made the more difficult in view of the fact that one of two innocent parties must bear the loss.
I.
The defense of the Statute of Limitations appears to be based on the lapse of time since 1941 when the painting is asserted to have been stolen from the plaintiff, or since 1955 when List bought the painting from Peris.
This defense, however, has been held unavailable to the defendants in this action, by the decision of Streit, J., (Feb. 7, 1964, affd. 22 A D 2d 647 [Oct. 6, 1964]). In replevin, as well as in conversion, the cause of action against a person who lawfully comes by a chattel arises, not upon the stealing or the taking, but upon the defendant’s refusal to convey the chattel *305 upon demand. (Cohen v. Keizer, Inc., 246 App. Div. 277 [1st Dept., 1936] [replevin]; Gillet v. Roberts, 57 N. Y. 28 [1874] [conversion].)
II.
Abandonment is defined as a voluntary relinquishment of a known right (Matter of Franmor Realty Corp. v. Le Boeuf, 201 Misc. 220 [Sup. Ct. Nassau County, 1951], affd. 279 App. Div. 795 [2d Dept., 1952]), with no intent to reclaim. (Matter of Johnson, 294 F. 258 [C. A. 5, 1923]; Matter of Kerns, 74 Cal. App. 2d 862, 868 [1946]); and see, particularly, Collac c. Etat Serbe-Croate-Slovene [Yugoslavia], IX Recueil des Decisions des Tribunaux Arbitraux Mixtes, 195 (Tribunal Arbitral Mixte Hungaro-Serbe-Croate-Slovene, 15 Mai 1929).
In Collac, it was held that personal property temporarily abandoned at the approach of the enemy, without the relinquishment of the owner’s right of ownership, is neither foreclosed nor forfeited.
The relinquishment here by the Menzels in order to flee for their lives was no more voluntary than the relinquishment of property during a holdup (cf. Penal Law, §§ 2120-2122; 77 C. J. S. Robbery, § 1, p. 448); and from the history of their search for the painting, there was obviously a continuing intent to reclaim.
The court finds, accordingly, as a matter of law, that there was here no abandonment.
HI.
Nor may this seizure be treated as lawful booty of war by conquering armies.
If the seizure is to be classified at all, it is to be classified as plunder and pillage, as those terms are understood in international and military law.
A.
Booty is defined as property necessary and indispensable for the conduct of war, such as food, means of transportation, and means of communication; and is lawfully taken. (See 5 Hackworth, Digest of International Law, pp. 682, 689 et seq.; Planters’ Bank v. Union Bank, 16 Wall. [83 U. S.] 483, 495 [1872].)
Booty is described in the Annex to the Hague Convention of 1907 ‘ ‘ between the United States and other Powers relative to the Opening of Hostilities ”, October 18, 1907, proclaimed February 28, 1910 (36 U. S. Stat. 2259 [art. 53, p. 2308]): “ An *306 army of occupation can only take possession of cash, funds, and realizable securities which are strictly the property of the State, depots of arms, means of transport, stores and supplies, and, generally all movable property belonging to the State which may be used for military operations.”[1]
The Hitler government’s definition was somewhat broader, but even that definition did not include works of art. A list of the goods decreed by that government from time to time to be booty, compiled by H. A. Smith, D. C. L. and collated in an article entitled “ Booty of War ”, published in 23 Brit. Y. B. Intl. L. (Oxford, 1946) 227, 229-230, is set forth in the accompanying footnote.[2]
*307 B.
Pillage, or plunder, on the other hand, is the taking of private property not necessary for the immediate prosecution of war effort, and is unlawful. (6 Hackworth, op. cit., supra, p. 403.)
Where pillage has taken place, the title of the original owner is not extinguished. (Mazzoni c. Finanze dello Stato, LII Il Foro Italiano 960 (Tribunale di Venezia, 1927); Collac c. Etat Serbe-Croate-Slovene [Yugoslavia], supra, IX Recueil des Decisions des Tribunaux Arbitraux Mixtes 195; 6 Hackworth, supra, 403.)
Said the Venetian court in Mazzoni, as translated and digested in Annual Digest of Public International Law Cases, 1927-1928 (London, 1931) at pages 564-565:
“ The argument that the property of citizens absent from occupied territory is to be considered res nullius, or war booty, cannot be admitted. * * *
“ [1] The principle based upon the Roman Law according to which property seized during a war is put on an equal footing with the property seized in the air, in the sea or in the earth, and which in a similar way becomes the property of the captor — since the right of war constitutes a just cause of acquisition— may be applicable to things liable or apt to be used for the needs of the army and belonging to the other belligerent. But it cannot be applied to private property which, if it has not become the object of requisition or sequestration, must be restored or compensated. The objects involved in the present case are private property which had not been requisitioned or sequestrated as it could not be used for the needs of the army. Their seizure must therefore be considered as having been effected by pillage. ’ ”
Similarly, in Collac (supra), it was held that personal propperty left behind at the approach of the enemy cannot automatically be considered as war booty; but it must be ascertained whether they belonged to a private person who, having temporarily abandoned them, has not relinquished his rights of ownership in such property.
*308 Indeed, the very description of the acts of Einsatzstab Rosenberg, in United States v. Goering (6 F. R. D. 69, 120) is entitled “ Pillage of Public and Private Property
And in the first order issued by the 21st Army Group, July, 1944, upon the return of Allied Forces to the French beachhead, where the question arose what German property was booty (“ butin de guerre ”), under the general principles of the laws of war, it was provided:
“ The Germans have acquired no title to private movable property * * * which has been acquired by theft, looting, or pillage.” (Note to article by Dr. Smith, 23 Brit. Y. B. Intl. L. 238-239 [1946], supra.)
IV.
We come now to the assertion that the Act of State Doctrine precludes any inquiry by this court into the validity of the acts of the Nazis.
The doctrine states, in terms of the most recent opinion on the subject by the Supreme Court of the United States, that “ the Judicial Branch [of the government] will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law ”. (Banco Nacional de Cuba v. Sabbatino, 376 U. S. 398, 428 [1964], supra.)
In Sabbatino, the Supreme Court held that the United States District Court was without power to inquire into the validity of a decree of the Cuban [Castro] government expropriating sugar which had belonged to a Cuban corporation whose stock was principally owned by United States residents, the effect being that the District Court was compelled to take the Cuban decree at face value.
Analysis of the doctrine, as thus stated by the Supreme Court, indicates that invocation of the doctrine rests upon the confluence of four factors:
(A) the taking must he by a foreign sovereign government;
(B) the taking must be within the territorial limitations of that government;
(C) the foreign government must he extant and recognized by this country at the time of suit;
(D) the taking must not be violative of a treaty obligation.
Analysis of the facts in the case at bar and the court’s own research into controlling principles lead inexorably to the conclusion that of these four factors, not one has been met.
*309 A.
THE TAKING WAS NOT BY A FOREIGN SOVEREIGN GOVERNMENT.
The receipt in evidence, dated March 31, 1941, was given on the stationery of the 1 ‘ Militarbef ehlshaber in Belgien und Nordfrankreich, Militárverwaltungschef, Einsatzstab der Dienststellen des Eeichsleiters Rosenberg.”
While the testimony and depositions before the court are not clear as to the place of the Einsatzstab and the Eeichsleiters Rosenberg as within or without the German government, the court has, in the course of its own research, come upon the nub of the relationship.
In the opinion and judgment of the International Military Tribunal in United States, French Republic, United Kingdom and U. S. S. R. v. Goering, Hess, Von Ribbentrop, Ley, Keitel, Kaltenbrunner, Rosenberg, et al., commonly called The Nurnberg Trial, International Military Trials, Nazi Conspiracy and Aggression, office of United States Chief Counsel for prosecution of Axis Criminality (United States Government Printing Office, 1947), likewise reported at 6 F. R. D. 69 (1946), the following lucid description of the activities of the ‘1 Einsatzstab * * * des Eeichsleiters Rosenberg ” is found (pp. 122-123):
“ The defendant Rosenberg was designated by Hitler on the 29th January 1940 Head of the Center for National Socialist Ideological and Educational Research, and thereafter the organization known as the ‘ Einsatzstab Rosenberg ’ conducted its operations on a very great scale. Originally designed for the establishment of a research library, it developed into a project for the seizure of cultural treasures. On the 1st March 1942, Hitler issued a further decree, authorizing Rosenberg to search libraries, lodges and cultural establishments, to seize material from these establishments, as well as cultural treasures owned by Jews. Similar directions were given where the ownership could not be clearly established. The decree directed the cooperation of the Wehrmacht High Command, and indicated that Rosenberg’s activities in the West were to be conducted in his capacity as Reichsleiter, and in the East in his capacity as Reiehsminister. Thereafter, Rosenberg’s activities were extended to the occupied countries. The report of Robert Scholz, Chief of the special staff for Pictorial Art, stated: ‘ During the period from March 1941 to July 1944 the special staff for Pictorial Art brought into the Reich 29 large shipments, including 137 freight cars with 4,174 cases of art works.’
‘ ‘ The report of Scholz refers to 25 portfolios of pictures of the most valuable works of the art collection seized in the West, *310 which portfolios were presented to the Fuehrer. Thirty-nine volumes, prepared by the Einsatzstab, contained photographs of paintings, textiles, furniture, candelabra and numerous other objects of art, and illustrated the value and magnitude of the collection which had been made. In many of the occupied countries private collections were robbed, libraries were plundered, and private houses were pillaged.
1 ‘ Museums, palaces and libraries in the occupied territories of the USSR were systematically looted. Rosenberg’s Einsatzstab, Ribbentrop’s special ‘ Battalion,’ the Reichscommissars and representatives of the Military Command seized objects of cultural and historical value belonging to the people of the Soviet Union, which were sent to Germany. Thus, the Reichscommissar of the Ukraine removed paintings and objects of art from Kiev and Kharkov and-sent them to East Prussia. Rare volumes and objects of art from the palaces of Peterhof, Tsarskoye Selo, and Pavlovsk were shipped to Germany. In his letter to Rosenberg of the 3rd October 1941 Reichscommissar Kube stated that the value of the objects of art taken from Byelorussia ran into millions of rubles. The scale of this plundering can also be seen in the letter sent from Rosenberg’s department to von Milde-Schreden in which it is stated that during the month of October 1943 alone, about 40 box-cars loaded with objects of cultural value were transported to the Reich.”
The evidence on which this excerpt from the decision is based is clear and free from doubt.
“ On 29 January 1940 Hitler issued a decree in the following terms:
“ ‘ The “ Hohe Schule ” is supposed to become the center for national-socialistic ideological and educational research ’ * * *
“ The staff of the Einsatzstab Rosenberg seized not only ‘ abandoned ’ art treasures but also treasures which had been hidden, or were left in the custody of depots or warehouses, including art treasures that were already packed for shipment to America.
“In a letter to Goering, 18 June, 1942, Rosenberg voiced the opinion that all art objects and other confiscated items should belong to the National Socialist .Party (NSDAP) because the party has been bearing the brunt of the battle against the persons and forces from whom this property was taken.
“ The National Socialist Party financed the operations of the Einsatzstab Rosenberg.”
(International Military Trials, vol. I, Nazi Conspiracy and Aggression, pp. 1097, 1099, 1100 [Office of United States Chief *311 Counsel for Prosecution of Axis Criminality; United States Government Printing Office, 1946].)
In the circumstances, the court finds that this painting was seized not by a foreign sovereign government but rather by “ The Centre for National Socialist Ideological and Educational Research ”, an organ of the Nazi party.
B.
THE TAKING WAS NOT WITHIN THE TERRITORY OF THE FOREIGN GOVERNMENT.
Since, as indicated, the taking was not by a foreign sovereign, the location of the property as within or without its jurisdiction is moot.
However, assuming, arguendo, that the taking had been by the German government, it would nevertheless be invalid because not within its own territory.
Brussels, the site of the appropriation of the painting, was the territory of Belgium. The government of the Kingdom of Belgium in exile, in March, 1941, was the recognized government of Belgium. The governments of Belgium and Holland “ continue to exist as international entities ”.
“Military occupation, by itself, does not confer title, nor extinguish a nation.”
“ [S]o long as a people do not accept military conquest; so long as they can manifest, in one way or another, their inalterable will to regain their freedom, their sovereignty, even though flouted, restricted, and sent into exile, still persists.” (35 Am. J. Int. Law, 666, 667 [Oct. 1941].)
C.
THE THIRD REICH WAS NEITHER EXTANT NOR RECOGNIZED BY THE GOVERNMENT OF THE UNITED STATES AT THE TIME OF TRIAL.
The Third Reich collapsed with the surrender in 1945. See The Axis in Defeat [Department of State, Publication 2423], page 45, Declaration regarding Defeat of Germany and Assumption of Supreme Authority by Allied Powers, June 5,1945.
D.
THE SEIZURE OF THIS PAINTING WAS IN VIOLATION OF SPECIFIC TREATY OBLIGATIONS TO THE UNITED STATES.
The Constitution of the United States provides (art. VI):
‘ ‘ This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land and the Judges in every *312 State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”
The Hague Conventions, to which Belgium, Germany, and the United States were parties, provided for “ recourse * * * to the good offices or mediation of one or more friendly Powers * * * before an appeal to arms”. (1899 Convention, Title II, Art. II; 32 U. S. Stat. 1779, 1785.) A similar clause was inserted in the Convention, for Pacific Settlement of International Disputes, of 1907 (pt. II, art. 2; 36 U. S. Stat. 2199, 2212).
In the accompanying 1907 Convention Relative to the Opening of Hostilities, article 1 provided: “The Contracting Powers recognize that hostilities between them must not commence without a previous and explicit ivarning, in the form of either a reasoned declaration of war or of an ultimatum with conditional declaration of war.” (36 U. S. Stat. 2271; italics supplied.)
Article 56 of the simultaneous Convention Respecting the Laws and Customs of War on Land provided as follows: “ The property of municipalities, of religious, charitable, educational, artistic and scientific institutions, although belonging to the state, is to be accorded the same standing as private property. All premeditated seizure, destruction or damage of such institutions, historical monuments, works of art and science, is forbidden ”. (36 U. S. Stat. 2309; 6 F. R. D. 69,120.)
And articles 46 and 47 provided as follows: ‘ ‘ Article 46. Family honour and rights, the lives of persons, and private property, as well as religious convictions and practice, must be respected.
“ Private property cannot be confiscated.” (36 U. S. Stat. 2306-2307; italics supplied.)
“Article 47. Pillage is formally forbidden.”[3] (36 U. S. Stat. 2307; italics supplied.)
*313 Conventions are, of course, treaties and the terms are interchangeably used. (5 Hackworth, op. cit. supra, p. 3.)
1.
The very invasion of Belgium was a violation of these solemn treaty obligations. (United States v. Goering, supra, pp. 102, 108.)[4]
2.
The pillage so rampant during Nazi occupation was specifically held to be in violation of article 56 of the Hague Convention of 1907. (United States v. Goering, supra, pp. 120-123.)
Accordingly, in any view of the case, the Act of State Doctrine has no application.
E.
The application of the “ Bernstein Exception ” to the Act of State Doctrine has been both vigorously asserted by the defense and opposed by the plaintiff.
The exception results from the peculiar history of the Bernstein cases.
Since the court is of the opinion that the Act of State Doctrine itself has no application to the case, it is unnecessary to pass upon an exception to the doctrine.
In view, however, of the arguments advanced by counsel with respect to the exception, and in view of the fact that it touches upon the argument of defendants’ good faith, the background and nature of the exception are treated in the accompanying footnote.[5]
*314 V.
A.
It is of no moment that Peris Galleries may have been a bona fide purchaser of the painting, in good faith and for value and without knowledge of the saga of the Menzels. No less is expected of an art gallery of distinction.
*315 Throughout the course of human history, the perpetration of evil has inevitably resulted in the suffering of the innocent, and those who act in good faith. And the principle has been basic in the law that a thief conveys no title as against the true owner. (Silsbury v. McCoon, 3 N. Y. 379, 383-384 [1850]; II Kent Comm. [14th ed.], per Holmes, 324-325.)
“ Provisions of law for the protection of purchasers in good faith which would defeat restitution [of Nazi confiscations] shall be disregarded.” (Law No. 59, U. S. Military Government for Germany, 10 Nov. 1947; Military Government Gazette, Amtsblatt der Militarregierung Deutschland, Amerikanisches Kontrollgebiet, pt. I, art. 1, par. 2. Cf. Re, Developments in Sovereign Immunity, 1 N. Y. L. F. 160, 201 [1955].)
B.
The court has considered the cases to which its attention was brought in letters dated January 11 and January 20, 1966, addressed to the court by counsel for the defense.
Republic of Iraq v. First Nat. City Bank (353 F. 2d 47, 51 [1965]) is a restatement of the Act of State Doctrine, and holds that the confiscatory act of even a friendly State will not be given effect where the situs of the property sought to be confiscated is in the United States and where the confiscation is contrary to our public policy and shocking to our sense of justice. (Re, supra, 1 N. Y. L. F. 201.)
In any event the Act of State Doctrine is inapplicable to the case at bar.
So, too, the court finds nothing in Hannes v. Kingdom of Roumania Monopolies Inst. (169 Misc. 544 [Sup. Ct., N. Y. County, 1938]), which touches upon the doctrine of sovereign immunity, inconsistent with the result here reached. And the judgment of dismissal there reached was reversed. (260 App. Div. 189 [1st Dept., 1940] Callahan, J.)
Finally, in Upright v. Mercury Business Mach. Co. (13 A D 2d 36 [1st Dept., 1961]), it was held that an assignment by a corporation organized in East Germany, a country not recognized by the United States, is not ipso facto unenforcible; but the court would look to the validity of the underlying transaction to determine whether it violates our national or public policy (p. 41); and it is a “ false notion, if it prevail anywhere, that an unrecognized government is always an evil thing and all that occurs within its governmental purview are always evil works. ’ ’
In the case at bar, the underlying transaction was the looting, plunder and pillage by the Nazis, which was of the very essence of evil. The Mercury ease, therefore, has no application.
*316 CONCLUSION
The jury has found plaintiff to he the sole and rightful owner of the painting. The court has found that she never abandoned it but that it was pillaged and plundered by the Nazis. No title could have been conveyed by them as against the rightful owners. The law stands as a bulwark against the handiwork of evil, to guard to rightful owners the fruits of their labors.
The motion to set aside the verdict is in all respects denied. Judgment may be entered accordingly.

. Of. Rules of Land Warfare, War Department of the United States:
“ 292. Means of transportation.— The military occupant exercises authority over all means of transportation, both public and private within the occupied district, and may seize and utilize them and regulate their operation.
“ 321. Two classes of movable property.— All movable property belonging to the State directly susceptible of-military use may be taken possession of as booty and utilized for the benefit of the invader’s government. Other movable property, not directly susceptible of military use, must be respected and cannot be appropriated.
“ 329. Pillage is formally forbidden.
“ 332, What included in rule.— The foregoing rule [art. LIII, par. 2, of the regulations annexed to the Hague convention quoted ante] includes everything susceptible of direct military use, such as cables, telephone, and telegraph plants, horses, and other draft and riding animals, motors, bicycles, motorcycles, carts, wagons, carriages, railways, railway plants, tramways, ships in port, all manner of craft in canals and rivers, balloons, airships, airplanes, depots of arms, whether military or sporting, and in general all kinds of war material.” (Basic Field Manual [FM 27-10, 1940] 77, 82, 84.)
Similar provisions are contained in the July, 1956 revision, Department of the Army, FM 27-10.

. (a) Cereals and fodder. This covered bread and all other cereal products, all animal fodder (except green staff to be used by the grower), peas, beans, and other pulses, rice, coffee substitutes, and tea.
(b) Animals and animal products, including game and wild animals fit for food. Animals could only be slaughtered by official permission.
(e) Milk, milk products, oils, and fats.
(d) Potatoes and potato products.
(e) Sugar-beet, sugar, and other sugar-beet products.
(f) Spreads for bread, dried vegetables, onions, and spices. This included all forms of jams and preserves.
(g) Eggs and egg products.
(h) Fish and fish products.
(i) 'Cocoa, chocolates, and confectionary.
(j) Coffee.
(k) Textiles and textile articles.
(l) Leather and leather products.
*307 (m) Furs, fur articles, hides and skins suitable for furs (other than those of tabby cats).
Normal household stocks were excluded in each case, and growing stocks were not subject to seizure before severance from the soil.
The general effect of these decrees, commented Dr. Smith, was: “ That all substantial stocks of the goods specified were regarded as being in law the property of the Reich and therefore liable to seizure as booty of war without any obligation to compensate individuals, though this did not exclude ex gratia payments in suitable cases.”

. The Pact of Paris, also known as the Kellogg-Briand Peace Pact of 1928, was likewise entered into by Belgium, Germany, and the United States. It provided:
“ Outlawry of War.
“ Article I
“ The High Contracting Parties solemnly declare in the names of their respective peoples that they condemn recourse to war for the solution of international controversies, and renounce it as an instrument of national policy in their relations with one another.
“ Article II
“The High Contracting Parties agree that the settlement or solution of all disputes or conflicts of whatever nature or of whatever origin they may be, which may arise among them, shall never be sought except by pacific means.” (46 U. S. Stat. 2343 et seq.)

. As Henry L. Stimson, the Secretary of State of the United States, said, in 1932: “ War between nations was renounced by the signatories of the KelloggBriand Treaty. This means that it has become throughout practically the entire world * * an illegal thing. Hereafter, when nations engage in armed conflict, either one or both of them must be termed violators of this general treaty law '* “ We denounce them as law breakers.” (6 F. R. D. 108.)

. Arnold Bernstein was a shipowner of the Jewish faith who lived in Germany. Under the Nazi regime, his worldly possessions were ruthlessly taken from him. In January, 1937, he was imprisoned in Hamburg, Germany, where he was given reasonable grounds to believe- that there were designs on his life as well as his liberty and business interests. While in prison, he was compelled by Nazi officials to execute documents purporting to transfer his shares in Arnold Bernstein Line to a Nazi designee, one Marius Boeger.
Boeger transferred his interest to Van Heyghen Freres S. A. and, in Federal court in New York, Bernstein, who survived, brought an action for conversion against Van Heyghen.
Applying the Act of State Doctrine, the United States Court of Appeals, affirming a judgment dismissing the complaint, stated: “No Court will exercise its jurisdiction to adjudicate the validity of the official acts of another state,”
*314 (Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F. 2d 246, 249-250 [C. A. 2d, 1947] cert, den., 332 ü. S. 772 [1947].)
In a later suit against Holland-Ameriea Line, Bernstein v. N. V. Nederlandsche-Amerikaansehe, etc. (173 F. 2d 71 [C. A. 2d, 1949]), a similar result was reached, although in an apparent attempt to avoid the applicability of the Act of State Doctrine as enunciated in his prior litigation, his complaint merely alleged duress, without mentioning Nazi officials.
Following the decision of the United States Court of Appeals, plaintiff Bernstein was able to secure an expression of views of the Department of State of the United States, which, for the first time, with respect to acts of the Nazis, relieved the courts of any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.
The expression of views, set forth in a letter dated April 13, 1949, to Bennett, House & Gouts, Counsellors at Law, New York, and signed by Jack B. Tate, Acting Legal Adviser, and published April 27, 1949, as a press release, and in the Department of State Bulletin (vol. XX, May 8, 1949, pp. 592-593) states, among other things, that: “It is this Government’s policy to undo the forced transfers and restitute identifiable property to the victims of Nazi persecution wrongfully deprived of such property; and ® * * to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.”
It was also stated in the letter, citing Military Government Law No. 59, applicable to the United States Area of Control, published in Military Government Gazette in Amtsblatt der Militarregierung Deutschland, Amerikaniehes Kontrollgebiet, Nov. 10, 1947, that “ this policy applies generally despite the existence of purchasers in good faith.”
The United States Court of Appeals, in view of this expression from the Department of State, proceeded (Bernstein v. N. V. Nederlanclsche-Amerikaansche etc 210 F. 2d 375 [1954]) to amend its mandate so as to permit the District Court to examine and to pass, without restraint, upon the acts of the Nazi officials.
Eventually the Bernstein eases wore settled; but the cases did serve to chart a new path and to graft an exception onto the Act of State Doctrine, the exception being that in the case of acts of Nazis, American courts might examine the official acts of another State. And the exception became known as the “ Bernstein exception ”.
In Sabbatino (supra) however, the Supreme Court, while not passing on the Bernstein exception, stated: “It is highly questionable whether the examination of validity by the judiciary should depend on an educated guess by the Executive as to probable result”. (376 U. S. 398, 436.)
In view of the court’s conclusion that the Act of State Doctrine is in any event inapplicable, the court does not reach the question of the applicability of the Bernstein Exception,