George STROGANOFF–SCHERBATOFF,
Plaintiff,

v.

Henry H. WELDON, Defendant.

George STROGANOFF–SCHERBATOFF,
Plaintiff,

v.

Charles B. WRIGHTSMAN and Jayne
Wrightsman, Defendants.

Nos. 74 Civ. 626, 74 Civ. 5750.

United States District Court,
S. D. New York.

May 18, 1976.

Lyman Stansky, New York City, for plaintiff.

Thal & Youtt, New York City by Harry E. Youtt, New York City, for defendant Weldon.

Davis, Polk & Wardwell, New York City, for defendants Wrightsman; Taggart

Whipple, Arthur F. Golden, Betty J. Pearce, New York City, of counsel.

## MEMORANDUM

BONSAL, District Judge.

Plaintiff George Stroganoff-Scherbatoff commenced these actions alleging conversion of certain works of art by defendants Henry H. Weldon, Charles B. Wrightsman and Jayne Wrightsman. Specifically, in a complaint filed February 6, 1974, plaintiff alleged that Henry H. Weldon "converted to his own use a painting known as Portrait of Antoine Triest, Bishop of Ghent, ["Triest Portrait"], by Sir Anthony Van Dyck, of the value of $50,000, the property of plaintiff." Then, in another complaint filed December 31, 1974, plaintiff alleged that Charles B. Wrightsman and Jayne Wrightsman converted to their own use a bust of Diderot by Houdon, described in Catalogue 2043 of Rudolph Lepke's Kunst-Auctions-Hause, No. 225 with a property value of $350,000. A subsequent suit, 75 Civ. 3174, was brought against the Metropolitan Museum of Art, the present owner of the Diderot bust, which was subsequently consolidated with the Wrightsman case by Court order dated September 30, 1975.[1]

Defendants now move pursuant to Fed.R. Civ.P. 56(b) for summary judgment in their favor. In support of his motion, defendant Weldon has submitted his own affidavit; the affidavit of his attorney, Harry E. Youtt, Esq.; the affidavit of Robert L. Manning, the Director-Curator of the Finch College Museum of Art; portions of the "Sammlung Stroganoff" or auction catalogue prepared for the auction in Berlin, May 12–13, 1931; and portions of the Catalogue de la Galerie des Tableaux of the Imperial Hermitage, St. Petersburg, Russia.

Defendants Wrightsman have submitted an affidavit by their attorney, Betty J. Pearce, Esq.; several documents including "The Stroganoff Palace-Museum—A Brief

1. On February 2, 1974, plaintiff commenced another action, 74 Civ. 625, alleging conversion by defendant Charles Wrightsman of a bust of Voltaire by Houdon. Subsequently, a suit was brought against the Metropolitan Museum of Art, 74 Civ. 3809, for the same cause of action. Both actions were consolidated for purposes of a joint trial by Order dated April 26, 1976.

Guide, St. Petersburg, 1922"; excerpts from the "Sammlung Stroganoff"; decrees of the All Russian Central Executive Committee and of the Council of People's Commissars; "Eighteenth Century French Art in the Stroganov Collection"; affidavits of the translators of these documents; documents on Soviet law and the Soviet Constitution; and the affidavit of Charles B. Wrightsman.

In opposition to these motions, plaintiff has submitted his own affidavit and a supplemental affidavit of his attorney, Lyman Stansky, Esq.

Before deciding these motions for summary judgment, the Court, in a Memorandum to Counsel, gave the parties ". . . an opportunity to submit further briefs on the Act of State and Statute of Limitations points in light of *Princess Paley Olga v. Weisz,* [1929] 1 K.B. 718; *Menzel v. List,* 22 A.D.2d 647, 253 N.Y.S.2d 43 (1964); and *Menzel v. List,* 49 Misc.2d 300, 267 N.Y.S.2d 804 (1966)." Supplemental memoranda of law and additional affidavits were subsequently filed by all parties.

It appears undisputed that both the Triest Portrait and the Diderot bust were sold in Berlin in 1931 at the Lepke Kunst-Auctions-Hause (hereinafter "Lepke Auction") by order of the Handelsvertretung or Trade Consulate of the U.S.S.R.[2] The Triest Portrait was purchased by the Frank T. Sabin Gallery in London which later sold it to the Alfred Brod Gallery, Ltd. in London. In 1963, defendant Weldon acquired the painting from the Brod Gallery and remains the present owner. It is unclear from the record who purchased the Diderot bust at the Lepke Auction; however, Charles B. Wrightsman later acquired the bust in June, 1965 from French & Company, Inc., a New York art dealer, and later donated it to the Metropolitan Museum of Art on or about November 14, 1974.

Plaintiff alleges that he is the direct descendant of Count Alexander Sergevitch Stroganoff, the original owner of both works of art, and that he is the rightful owner of these works of art by reason of familial succession. Plaintiff contends that the auction catalogue for the Lepke Auction described these works as part of the Stroganoff Collection. ("Sammlung Stroganoff".)

Defendant Weldon contends that the auction catalogue does not support plaintiff's contentions that the Triest Portrait was part of the Stroganoff Collection. Rather, Weldon contends that the Portrait was part of the collection of the Imperial Hermitage Museum in St. Petersburg, Russia.[3] Moreover, defendant Weldon contends that even if plaintiff can prove ownership of the painting by familial succession, the Court is barred from granting any relief by reason of the Act of State Doctrine.

Defendants Wrightsman also contend that the Act of State Doctrine bars any relief.

### The Act of State Doctrine

■ The Act of State Doctrine requires courts of this country to refrain from independent examination of the validity of a taking of property by a sovereign state where 1) the foreign government is recognized by the United States at the time of the lawsuit, and 2) the taking of the property by the foreign sovereign occurred within its own territorial boundaries.

In *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), plaintiff brought suit against the defendant, the commander of a revolutionary army in Venezuela, for damages caused by defendant's refusal to issue a passport and for alleged assaults and affronts by defendant's soldiers in Venezuela. Since the United States had recognized the defendant's revolutionary government as the legitimate government of Venezuela, the Court held:

"Every sovereign state is bound to respect the independence of every other

---

**2.** See affidavit of Johann Wille dated December 5, 1975.

**3.** See affidavit of Robert L. Manning dated February 7, 1975, attached to defendant Weldon's Motion for Summary Judgment.

sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Id.* at 252, 18 S.Ct. at 84.

Then, in *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), hides were seized in Mexico from a Mexican citizen by General Villa, acting on behalf of General Carranza, and were sold in Mexico to a Texas corporation which shipped them to the United States where they were sold to defendant. Plaintiff claimed title to the hides as assignee of the Mexican citizen. Taking note of the fact that the United States had recognized the Government of Carranza as the *de facto* government of Mexico in 1915, and as the *de jure* government in 1917, the Court denied plaintiff's request for relief and held:

"Plainly this was the action, in Mexico, of the legitimate Mexican government when dealing with a Mexican citizen, and, as we have seen, for the soundest reasons, and upon repeated decisions of this court such action is not subject to re-examination and modification by the courts of this country." *Id.* at 303, 38 S.Ct. at 311.

The Act of State Doctrine was again applied in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), a case involving the expropriation by the Cuban Government of property located in Cuba but owned principally by American nationals. There, the Court held:

". . . the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." *Id.* at 428, 84 S.Ct. at 940.

Here, the record shows that the works of art, whether in the Stroganoff Palace or in the Imperial Hermitage Museum, were appropriated by the Soviet Government under either Decree No. 111 of the Council of People's Commissars published on March 5, 1921, which nationalized all movable property of citizens who had fled the Soviet Union,[4] or Decree No. 245 of March 8, 1923, promulgated by the All Russian Central Executive Committee and the Council of People's Commissars, which nationalized property housed in State Museums. In addition, at the time of the Lepke Auction in Berlin, plaintiff's mother, Princess Stroganoff-Scherbatoff, wrote a public letter of protest stating that:

"This collection remains entirely my property. *The Soviet republic has taken possession of this collection* in a way that sets at defiance every principle of international law." (Emphasis added.) *New York Herald Tribune,* May 13, 1931, at 15.

While plaintiff contends that the "taking" did not occur within the territory of the Soviet Union but in Berlin at the Lepke Auction and, under such circumstances, the Act of State Doctrine is inapplicable, the record indicates that the works of art were appropriated in Russia, prior to the Lepke Auction, and were transported to Berlin by the Soviet Government solely for the purpose of the public sale.

In *Princess Paley Olga v. Weisz,* [1929] 1 K.B. 718, the British Court of Appeal was faced with a case involving similar facts. There, a Russian refugee noble, Princess Paley Olga, instituted an action in the British courts to recover certain furniture and art objects that had been in the Paley Palace, near St. Petersburg, and which were sold by the Soviet Government to the defendant in 1928. Relying in part on Decree No. 111 of the Council of People's Commissars published on March 5, 1921, and Decree No. 245 promulgated by the All Russian Central Executive Committee and of the Council of People's Commissars in March

4. Plaintiff denies that Count Alexander Sergevitch Stroganoff fled the Soviet Union in 1919 and thus disputes the applicability of Decree No. 111 of March 5, 1921 to the facts of this case.

1923, the defendant Weisz contended that the articles in question had ceased to be the property of the plaintiff and were in the possession of the Soviet Government as public property. Since that Government was the Government of a foreign sovereign State, and had been recognized as such by the English Government in 1924, defendant contended that the plaintiff could not dispute the validity of the appropriation of the articles by the Soviet Government in the British courts. In affirming the lower court's decision that plaintiff's action must fail, the Court of Appeal (Scrutton, L. J.) held:

> "Our Government has recognized the present Russian Government as the de jure Government of Russia, and our Courts are bound to give effect to the laws and acts of that Government so far as they relate to property within that jurisdiction when it was affected by those laws and acts." *Id.* at 725.

Here it appears that the Triest Portrait and the Diderot bust were transported to Berlin for public sale in May 1931 at the direction of the Soviet Government. The Soviet Government had been recognized by the United States as the *de jure* government of Russia in 1933. Whether the works of art had been appropriated under Decree No. 111 of March 5, 1921 or Decree No. 245 of March 8, 1923 appears to be immaterial. The sale of the Stroganoff Collection was held by order of the Handelsvertretung and as such was carried out under the direction and with the consent of the Soviet Government. While the actual sale of the works of art occurred in Berlin, the property had been seized in Russia by the Soviet Government.

Unlike the situation in *Menzel v. List,* 49 Misc.2d 300, 267 N.Y.S.2d 804 (1966), where the taking was by an organ of the Nazi Party, not a sovereign state, and the Act of State Doctrine was held inapplicable, here, the Soviet Government, by official decrees of its political organs, had acquired the works of art in Russia prior to their public sale in Berlin in 1931. Moreover, in *Menzel v. List,* the appropriation of the painting was in Belgium and the Government of the Kingdom of Belgium, although in exile at the time, was still the recognized government of Belgium. Here, the appropriation was by the Soviet Union and occurred within the territorial boundaries of the Soviet Union.

Thus, it seems clear that, on this record, plaintiff is precluded from recovery by reason of the Act of State Doctrine. *Banco Nacional de Cuba v. Sabbatino, supra* ; *see Princess Paley Olga v. Weisz, supra.* In view of the foregoing, the Court does not reach the statute of limitations issue.[5]

Accordingly, defendants' motions for summary judgment are granted.

It is so ordered.

---

**5.** Plaintiff has brought these suits for conversion of works of art. Under the applicable New York statute, New York Civil Practice Law and Rules ("CPLR") § 214(3) (McKinney 1972), "an action to recover a chattel or damages for the taking or detaining of a chattel . . . must be commenced within three years." (Section 214(3) of the CPLR, effective September 1, 1963, replaced former Section 48(4) of the Civil Practice Act which provided a six-year statute of limitations.)

Moreover, under New York CPLR § 206(a), a demand is necessary before a person is entitled to bring an action in conversion. That statute provides, in part:

> ". . . where a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete."

Here, it would appear that the right of plaintiff's mother to make the demand was complete in 1931 when the works of art were sold at the Lepke Auction in Berlin. Under the New York statute of limitations, it would appear that the time for commencing an action in conversion had already run at the time of Princess Stroganoff-Scherbatoff's death in 1944.