Martin **GROSZ** and Lilian Grosz, Plaintiffs,

v.

The **MUSEUM OF MODERN ART,** Defendant,

Herrmann–Neisse With Cognac, Self–Portrait With Model and Republican Automatons, Three Paintings by Grosz, Defendants-in-rem.

No. 09 Civ. 3706(CM)(THK).

United States District Court, S.D. New York.

Jan. 6, 2010.

Opinion Denying Reconsideration March 3, 2010.

474

Raymond James Dowd, Dunnington, Bartholow & Miller, LLP, New York, NY, for Plaintiffs.

Jennifer Lindsay Jones, Louis M. Solomon, Margaret Antinori Dale, Proskauer Rose LLP, New York, NY, for Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

McMAHON, District Judge:

### *INTRODUCTION*

George Grosz was an early twentieth-century German artist and prominent member of a movement known as the Berlin Dada and New Objectivity Group. His artwork, consonant with the larger movement, was strongly anti-totalitarian and therefore anti-Nazi. (*See* First Am. Compl. ("Complaint"), May 28, 2009, ¶¶ 2–3.)

Grosz's son and daughter-in-law, Martin and Lilian Grosz (plaintiffs in this lawsuit), explain that, although Grosz was not Jewish, his work "typified" the kind of "'degenerate' art Hitler hated." (*Id.* ¶ 3.) As a result, Grosz was forced to flee Germany in the wake of Hitler's ascension to Chancellor in 1933. (*Id.* ¶¶ 3, 45–46.) After his departure, the Third Reich branded him an "enemy of the state" (*id.* ¶ 124), and in March 1938, the government rendered him "stateless," revoking his citizenship and confiscating what remained of his German assets (*id.* ¶ 102).

This action relates to the ownership of three of Grosz's caricatural paintings, which are alleged to have fallen prey to Nazi looting (albeit indirectly) in the years between Grosz's emigration from Germany in 1933 and the German government's confiscation of his assets in 1938. Specifically, the plaintiffs allege that the Museum of Modern Art ("MoMA") obtained and now wrongfully holds: *Hermann–Neisse with Cognac ("Poet")*, *Self–Portrait with Model ("Self–Portrait")*, and *Republican Automatons ("Automatons")* (collectively, the "Paintings"). (*Id.* ¶¶ 11–15.) The plaintiffs seek declaration of title and replevin for each, as well as damages for unlawful dominion and control over the artworks, attorneys' fees, costs, and disgorgement of profits and revenues received by MoMA from possession of the Paintings. (*Id.* ¶¶ 25, 149–74 (claims).) [1]

Because this action is barred by the statute of limitations, the defendant's motion to dismiss is granted.

### *DISCUSSION*

### I. Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir.2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*citing Twombly*, 550 U.S. at

---

**1.** Plaintiffs' Complaint includes two sets of paragraphs numbered 149–171, presumably because, when they amended their initial pleading, they failed to adjust the numbering of the paragraphs. For ease of reference, the Court will use the plaintiffs' numbering but will indicate parenthetically when the numbering refers to the "claims" portion of plaintiffs' complaint (located at pages 33–36).

556, 127 S.Ct. 1955). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *Iqbal,* 129 S.Ct. at 1950–51.

■ In deciding a motion to dismiss, this Court may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed, or knew about and relied upon in bringing the suit. *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996).

## II. Timeliness

The lapse of a limitations period is an affirmative defense that a defendant must plead and prove. Fed.R.Civ.P. 8(c)(1). However, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint. *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (affirmative defense of qualified immunity); see also 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1226 (3d ed. 2004) ("[T]he current trend in the cases is to allow [the statute of limitations defense] to be raised by a motion to dismiss under Rule 12(b)(6) when the defect appears on the face of the complaint."). Timeliness is "material when testing the sufficiency of a pleading." Fed.R.Civ.P. 9(f).

## III. Background

The Complaint alleges that George Grosz created the Paintings at various dates between 1920 and 1929. It appears undisputed that he created *Automatons* first, in 1920 (*id.* ¶ 15), followed by *Poet,* which he painted in 1927 or 1928 (*id.* ¶ 38 (1927); *id.* ¶ 11, (1928)). *Self–Portrait* is alleged to have been created in either 1928 or 1929. (*Id.* ¶ 39 (1928); *id.* ¶ 13 (1929).)

The plaintiffs contend that each of the Paintings was consigned at one time or another to Alfred Flechtheim, Grosz's art dealer (*id.* ¶¶ 38–39), and that after Flechtheim's death in 1937, the three Paintings fell prey to a network of unscrupulous art professionals, who took advantage of the political climate of the time to divest Grosz of his ownership. First, they allege that within one month of the dealer's death, an opportunistic art historian (Charlotte Weidler) stole *Poet,* which she is alleged to have hidden in Germany until 1952, when she sold it to MoMA. Less than one year later, in February 1938, a plundering Dutch art dealer (Carel van Lier) stole and then purported to auction off *Self–Portrait* and *Automatons.* The plaintiffs allege that the auction was a "sham," designed to obfuscate the true nature of van Lier's operations—laundering Nazi-looted art—as evidenced by the fact that van Lier "purchased" both pieces himself at suspiciously below market prices. Shortly thereafter, the Dutch dealer sold the pieces to private collectors for a handsome profit.

*Automatons* eventually made its way to Canada; MoMA purchased it from its owner in 1946. (*Id.* ¶¶ 58–59.) Eight years later, after a failed attempt to sell *Self–Portrait,* Leo Lionni, then-Art Director for *Fortune,* gifted the piece to the museum in 1954. (*Id.* ¶ 56.)

The precise path the Paintings allegedly took on their journey from Berlin to

MoMA, and the role of each of the alleged middlemen, is chronicled in detail below.

## A. *Grosz's Art Dealer: Alfred Flechtheim*

George Grosz's art dealer was Alfred Flechtheim, who owned and operated Galerie Flechtheim (the "Galerie"), which had outposts in both Berlin and Dusseldorf. (*Id.* ¶ 47.) Grosz's first art exhibition took place at Flechtheim's Berlin gallery in the early 1920s. (*Id.* ¶ 37.) The Complaint does not specify which works were displayed, but states that the show was such a resounding success that, by 1925, Galerie Flechtheim had entered into an agreement with Grosz to be his exclusive dealer. (*Id.*) The terms of the agreement provided that Grosz would receive monthly payments of 300 to 800 Reichmarks ("RM") in exchange for consigning his work solely to the Galerie. (*See id.*)

Pursuant to this agreement, *Poet* was consigned to Flechtheim in 1928 as "Kleiner Portrait Max Hermann (mit cognac flasche)." It appears to have been the first of the Paintings Grosz consigned to the Galerie. (*Id.* ¶¶ 38, 137 & Ex. 1.) One year later, Grosz consigned *Self–Portrait*, known then as "Das Modell," to Flechtheim. (*Id.* ¶ 39 & Ex. 1.) The Complaint does not allege when *Automatons* might have been consigned to the Galerie.

Some documents attached to the Complaint suggest that Grosz offered Flechtheim one or more of his artworks as "security" for a debt Grosz owed to the dealer. For example, a letter from Flechtheim to Grosz written in April 1934 refers to "watercolors which you sent me as security" as well as "oil pictures, which you also sent me as security." (*Id.* Ex. 7.)

A subsequent letter from Flechtheim's liquidator to Grosz reminds the artist that he "still owe[s] the gallery RM 16,255." (*Id.* Ex. 6.) [2]

Flechtheim apparently went out of business at some point. The plaintiffs speculate that his liquidation was the result of Nazi coercion, but that theory is contradicted by certain documents they have attached to their Complaint, including letters between Grosz and Flechtheim. These documents suggest that Flechtheim's liquidation was precipitated by his acute financial troubles, going back as far as 1931, before the Nazis came to power. (*See id.* Ex. 3.) A letter from Flechtheim to Grosz dated April 15, 1934, explains that the dealer's "German galleries [had] totally collapsed financially," that it "was only with great effort ... that [his] liquidator succeeded in preventing bankruptcy," and that he was selling "all [his] pictures ... for the account of creditors in London" where he had spent 2 months "and hope[d] to get [his] feet on the ground." (*Id.* Ex. 7.) By the time he wrote this letter to Grosz, Flechtheim's Berlin gallery had already been liquidated, though it was not "officially dissolved and removed from Berlin's commercial registry" until nearly three years later, on February 20, 1937. (*Id.* ¶¶ 52, 137.)

Notwithstanding his financial missteps, Flechtheim continued to consign Grosz's works on an ad hoc basis until his death in London in 1937. (*See, e.g., id.* ¶¶ 16, 48, 149 & Ex. 7.) At the time of the dealer's death, the Complaint alleges that Flechtheim had consigned *Self–Portrait* to Kunstzaal van Lier in Amsterdam and *Automatons* to the Mayor Gallery in London.

---

**2.** The plaintiffs dispute the validity of the debt-they suggest that the Nazis coerced Flechtheim into liquidating his holdings in exchange for his safe departure from the country, the debt having been fabricated as part of the Nazi scheme. (*Id.* ¶ 47.) In the alternative, they argue that at least *Poet* "could not possibly have been transferred as an offset" against any alleged debt. (*Id.* ¶¶ 131, 137–38.)

(*See id.* ¶ 51 (*Self–Portrait*); *id.* ¶ 57 (*Automatons*).) The Complaint further alleges that, while *Poet* had been consigned from time to time—including one consignment in 1932 when it was displayed at Palais des Beaux Arts in Brussels—by 1937 the painting was back in Berlin, unconsigned. (*Cf. id.* ¶ 55.)

### B. *Amsterdam Art Dealer Carel van Lier*

Carel van Lier is alleged to have been a cunning Dutch art dealer who ran Kunstzaal van Lier in Amsterdam, where *Self Portrait* was consigned in 1936 (and where it remained upon Flechtheim's death the following year). (*Id.* ¶ 51.) In early 1938, van Lier arranged to have *Automatons* transferred to his Kunstzaal from the Mayor Gallery in London, where Flechtheim had consigned it in 1934. (*Id.* ¶¶ 16, 57.) The Complaint does not allege who authorized the transfer.

Later that year, van Lier, whom the plaintiffs accuse of having "lacked any moral compass," allegedly arranged a "sham" auction at the Mak van Waay auction house in Holland to launder artworks stolen by the Nazis. (*See id.* ¶ 57.) At that "auction," van Lier purportedly purchased a collection of Grosz's pieces that he himself had "put up for auction," including *Self Portrait*, which the plaintiffs suggest he bought at a deeply discounted price. (*Id.* ¶ 56 (16 guilder for *Self Portrait*).) A couple of months later, he resold the piece for a handsome profit to Leo Lionni, who was then the Art Director of *Fortune* magazine. (*Id.*)

Meanwhile, *Automatons* was bundled with three other watercolors and one drawing, which were collectively sold at the same auction for 25 guilders. (*Id.* ¶ 57.) An individual known simply as "Brant" or "Brandt" (both names appear in the Complaint) is alleged to have been the purchaser. (*Id.* ¶¶ 16, 57.) Brandt then sold the work to Dr. Herbert Tannenbaum in 1939 for an unknown amount, and Dr. Tannenbaum soon thereafter sold the piece to Dr. William Landman of Toronto, from whom MoMA would ultimately purchase the piece in 1946. (*Id.* ¶¶ 58–59.)

### C. *Art Historian Charlotte Weidler*

While van Lier was auctioning off *Self–Portrait* and *Automatons,* Charlotte Weidler is alleged to have been busy embezzling the third of the three Paintings (*Poet*). Weidler was a German art dealer, critic and curator for the Carnegie Institute in Pittsburgh. (*Id.* ¶ 74.) One month after Flechtheim's death in April 1937, in a letter to a fellow art historian, Weidler claimed that she had "inherited" *Poet* from the late dealer. (*Id.* ¶¶ 12, 74–75 & Ex. 16.) The plaintiffs suggest that Weidler was actually an international art thief and/or Nazi agent, who wrongfully and willfully converted the painting. (*Id.* ¶¶ 76, 12.)

In support of their theory, the plaintiffs recount the fate of the art collection of one Paul Westheim. Westheim was a modernist art collector who entrusted his portfolio to Weidler shortly before he fled Berlin. (*Id.* ¶ 79.) The Complaint says nothing about the precise date Westheim left Germany, but it appears to have been some time in the 1920s, and in any event before the Nazis came to power in 1933, because Weidler attempted to sell Westheim's collection to MoMA in either 1929 or 1930 (with no authorization to do so). (*Id.* ¶ 80 & Ex. 20.)

The plaintiffs further allege that Weidler would come to New York in 1939 as a Nazi agent. (*See id.* ¶¶ 77–78.) The plaintiffs back their allegation with a handful of letters (all of them rank hearsay) between an assistant director of the Freer Gallery of Art in Washington, D.C., and a trustee of the Carnegie Institute, in which the two

speculate that Weidler might be a Nazi—though, their suspicions, as they acknowledge, lacked a certain "logical" basis. (*Id.* ¶ 78 & Ex. 17.) For example, one of the letters explains:

> Not for one minute do I want to persuade you that Dr. Weidler is in truth what she claims to be—anti-Nazi. I, personally, have a hunch that she is not … but there is nothing I can offer in proof. Nothing at all; but at times I am blessed with a feminine intuition and you know that often it is as certain as it is without logic.

(*Id.* Ex. 17.)

Whether or not Weidler may was an agent of the Third Reich, she did contact MoMA in 1950 in an attempt to sell *Poet* to the museum. (*Id.* ¶ 87.) Unable to persuade MoMA to purchase the piece, Weidler then contacted Alfred Flechtheim's one-time assistant, Curt Valentin, to help her liquidate the work. (*Id.* ¶ 90.) In 1952, Valentin was successful in brokering a deal with MoMA for *Poet,* which became museum property on April 10 of that year. (*Id.*)

The Complaint does not explain how Weidler was acquainted with Valentin, although the plaintiffs do allege that Valentin, like Weidler, was a "Nazi agent" who set up the Buchholz Gallery in New York, through which the deal with MoMA over *Poet* was brokered, in order "to sell Nazi-looted artworks." (*Id.* ¶ 60 Heading)

### D. *MoMA's Director: Alfred Barr*

The man who purchased *Poet* on MoMA's behalf was Afred Barr, the long-time director of the museum. (*Id.* ¶ 90.) The plaintiffs allege that, when Weidler approached MoMA, "Barr clearly knew that Weidler was trying to sell a stolen Grosz to him." (*Id.* ¶ 88.) In support of their assertion, the plaintiffs offer three circumstantial allegations.

First, they point out that thirteen years before he purchased *Poet* from Weidler, Barr may have purchased Nazi-looted art through Alfred Flechtheim's former assistant, Curt Valentin. (*See id.* ¶¶ 65–67 & Ex. 13.) Specifically, the Complaint alleges that Ban-used Valentin as his agent in 1939 to purchase five pieces (none by Grosz) at an auction in Lucerne, Switzerland-works that had been "part of a monstrous Nazi seizure of all modern works from German museums and private owners during the previous year." (*Id.* Ex. 14.)

Second, the Complaint alleges that MoMA never contacted the artist to sign or restore the painting, even though the museum knew that Grosz lived in New York. (*Id.* ¶ 91.)

Third, the Complaint argues that neither Barr nor anyone else at MoMA did any research into the painting's ownership or provenance before its purchase, intimating that Barr sought actively to avoid being confronted with what he knew to be the painting's tainted history. (*Id.*)

In their response to defendants' motion to dismiss, plaintiffs disavow any suggestion that these allegations are intended to allege that MoMA purchased the painting in bad faith. Stating that "the words 'bad faith' do not appear in the Complaint" (and indeed those precise words do not appear in the pleading), they contend that the Complaint alleges "only that MoMA was on notice of facts warranting investigation because it knew the Paintings had been held on consignment by Flechtheim, a Jew persecuted by the Nazis." (Pls. Mem. of Law in Opp. to Mot. to Dismiss ("MTD Opp."), June 25, 2009, at 15–16 (citation omitted).) The reason for this wholly unconvincing change of position will become apparent when the Court discusses the peculiarities statute of limitations relating to conversion and how that affects the

timeliness of plaintiffs' claim to *Poet. See infra* Part IV.

### E. *Grosz Sees Poet in MoMA But Does Not Try to Reclaim the Painting*

The artist himself saw *Poet* on display at the museum in 1953, barely a year after Barr had purchased it from Weidler. At that time, the Grosz wrote to his brother-in-law: "Modern Museum exhibits a painting stolen from me (I am powerless against that) they bought it from someone, who stole it." (Compl. ¶ 105.) In a second letter dated January 9, 1953, Grosz wrote: 'Modern Museum bought a painting that was stolen from me ... (one cannot do anything) old affair.' (*Id.*) Sadly, the artist would die six and a half years later, on July 6, 1959; during those six and one half years he never contacted anyone at MoMA to seek restitution of the painting.

### F. *The Instant Action*

On November 24, 2003, forty-four years after Grosz's death, Ralph Jentsch, "managing director of the George Grosz Estate and author of [the artist's] catalogue raisonne," finally asked MoMA to return *Poet* to the estate—along with *Self-Portrait* and *Automatons,* which he also thought had been wrongfully taken from Grosz during his lifetime. (*Id.* ¶ 117 & Ex. 26.)

Plaintiffs assert that this demand was not refused MoMA until the museum sent them a letter on April 12, 2006. (MTD Opp. at 9.) They filed their Complaint, which included, inter alia, claims for conversion, replevin, declaratory judgment and "constructive trust" on April 10, 2009—almost three years to the day after the letter on which plaintiffs rely. (*Id.* ¶¶ 149–174 (claims).)

On June 4, 2009, defendants moved to dismiss the Complaint as time barred, under a variety of theories

### IV. The Statute of Limitations

New York Civil Practice Law and Rules ("CPLR") provides that "an action to recover a chattel or damages for the taking or detaining of a chattel [replevin or conversion] ... must be commenced within three years," CPLR § 214(3), computed from "the time the cause of action accrued to the time the claim is interposed," CPLR § 203(a). While a claim for declaratory judgment without a prescribed limitations period usually enjoys a six-year limitations period under CPLR 213(1), in cases like this where a claim "could have been made in a form other than an action for a declaratory judgment [i.e., an action for conversion or replevin] and the limitations period for an action in that form has already expired, the time for asserting the claim cannot be extended through the simple expedient of denominating the action one for declaratory relief." *New York City Health & Hospitals Corp. v. McBarnette,* 84 N.Y.2d 194, 201, 616 N.Y.S.2d 1, 639 N.E.2d 740 (1994). Finally, it is settled law that where, as here, both "a legal and an equitable remedy exists as to the same subject-matter, the latter is under the control of the same statutory bar as the former." *Keys v. Leopold,* 241 N.Y. 189, 189, 149 N.E. 828 (1925) (action for accounting and breach of contract); *accord Norris v. Grosvenor Mktg. Ltd.,* 803 F.2d 1281 (2d Cir.1986). Accordingly, the three year statute of limitations for conversion and replevin (CPLR § 214(3)) applies to all of the plaintiffs' claims.

The question before this Court is when that three years began to run.

### A. *Accrual: New York's Demand and Refusal Rule*

Under New York law, the statute of limitations for conversion and replevin automatically begins to run against a bad faith possessor on the date of the theft or

bad faith acquisition—even if the true owner is unaware the chattel is missing. *Close–Barzin v. Christie's, Inc.*, 51 A.D.3d 444, 444, 857 N.Y.S.2d 545 (N.Y.App. Div. 1st Dep't 2008). By contrast, "An innocent purchaser of stolen goods becomes a wrongdoer only *after* refusing the owner's demand for their return." *Kunstsammlungen Zu Weimar v. Elicofon*, 678 F.2d 1150, 1161 (2d Cir.1982) (citing cases, emphasis added). Therefore, a cause of action accrues against a bona fide purchaser when the purchaser refuses to return the property in question. *Id.* Dubbed the "demand-and-refusal rule," this axiom of New York law dates back to 1966, when the New York County Supreme Court became the first court in the country to address the statute of limitations issue in the context of an action to recover a stolen painting. *See Menzel v. List*, 49 Misc.2d 300, 267 N.Y.S.2d 804 (N.Y.Sup.Ct.1966).

The plaintiff in *Menzel* sought to recover a piece by Marc Chagall that she and her late husband had been forced to leave behind when they fled Belgium after the Nazis occupied that country. *Id.* at 302, 267 N.Y.S.2d 804. Shortly after their departure, the Nazis declared the piece to be "decadent Jewish art" and seized it for "safekeeping." *Id.* at 301, 267 N.Y.S.2d 804. The piece resurfaced in Paris in 1955, when a New York art dealer purchased it and then promptly resold it. *Id.* at 303, 267 N.Y.S.2d 804. The plaintiff had been diligently searching for the work since the end of the war, but was unable to locate it until 1962. When the purchaser refused to return the painting, she filed suit. *Id.* at 301, 267 N.Y.S.2d 804.

At trial, the defendant established that he was an innocent purchaser who had no notice that the painting had been stolen. He pleaded the statute of limitations as a defense, based on either (1) the lapse of time since 1941, when the plaintiff had first been divested of custody, or in the alternative, (2) the lapse of time since 1955, when he purchased the piece.

The court disagreed with his argument, holding instead that a cause of action for conversion or replevin accrues "against a person who lawfully comes by a chattel arises, not upon the stealing or the taking, but upon the defendant's refusal to convey the chattel upon demand." *Id.* at 304, 267 N.Y.S.2d 804 (*citing Cohen v. M. Keizer, Inc.*, 246 App.Div. 277, 285 N.Y.S. 488 (1st Dep't 1936); *Gillet v. Roberts*, 57 N.Y. 28 (1874)). The court reasoned that until a demand is made and refused, an innocent purchaser's possession is neither wrongful nor unlawful. He should be "informed of the defect in his title and have an opportunity to deliver the property to the true owner, before he shall be made liable as a tortfeasor for a wrongful conversion." *Gillet*, 57 N.Y. at 34 (alterations omitted). Thus, the court concluded, Menzel was entitled to replevy her painting.

### B. *Unreasonable Delay*

Under the demand-and-refusal rule as set forth in *Menzel*, it appears that a person who knows where a missing item is could delay the accrual of an action against a good faith purchaser indefinitely simply by failing to make a demand. It is undisputed that Grosz knew where at least one of the works—*Poet*—was a half century before plaintiffs demanded its return. But Grosz never demanded the return of the work. Since plaintiffs have no more right to *Poet* than Grosz would have had if he were still alive, MoMA argues that Grosz's unreasonable delay caused the statute to begin running shortly after he encountered the work in 1953.

Whether unreasonable delay starts the statute running remains an open question under New York law. Clearly, a party cannot delay making demand indefinitely. However, one judge in this district has

concluded that the issue of "unreasonable delay" is relevant only to laches, not to accrual of the action. *See Republic of Turkey v. Metropolitan Museum of Art,* 762 F.Supp. 44, 46 (S.D.N.Y.1990).

*Republic of Turkey* involved artifacts that were excavated from burial mounds in the Ushak region of Turkey, exported to the United States in contravention of Turkish law, and eventually purchased by the Metropolitan Museum of Art. *Id.* at 45. In that case, the Turkish government (plaintiff) was alleged to have had "actual knowledge of the facts needed to make a demand" more than a decade and a half before it filed its action. *Id.* at 46. In denying the defendant's motion to dismiss the action as time barred, the court held that the reasonableness of the plaintiff's delay in filing suit did not bear on the statute of limitations but was properly raised only in the context of laches. *Id.* at 46–47.

■ This Court agrees with the reasoning of *Republic of Turkey,* and holds that the issue of unreasonable delay is relevant only to the defense of laches—even where, as here, it is undisputed that a potential plaintiff (Grosz) had actual knowledge of the whereabouts of at least one of the missing art works (*Poet* ) a half century before anyone tried to replevy the piece. In light of the fact-sensitive nature of a laches inquiry, it would be premature to resolve the question now—especially as it is unnecessary to reach the issue, because plaintiffs' suit is plainly time barred.

### C. Plaintiffs' Demand and MoMA's Refusal

For purposes of deciding this motion, I will assume *arguendo* that the position taken by plaintiffs in their opposition papers—namely, that the Complaint does not allege that any of the works were purchased by the museum with knowledge that they had been stolen—is true.[3] On that assumption, the demand and refusal rule governs when the statute of limitations began to run, and plaintiffs' claims against the museum accrued on the date MoMA rejected plaintiffs' November 24, 2003 demand.[4] All parties agree that MoMA has in fact rejected plaintiffs' demand and refused to return the Paintings. They differ only on the date when rejection occurred.

■ Though there is little case law addressing what constitutes a "refusal" for purposes of the statute of limitations, the cases that exist hold that, "A refusal need not use the specific word 'refuse' *so long as it clearly conveys an intent to interfere with the demander's possession or use of his property."* *Feld v. Feld,* 279 A.D.2d 393, 395, 720 N.Y.S.2d 35 (N.Y.App. Div. 1st Dep't 2001) (citation omitted, emphasis added); *see also Spanierman Gallery v. Merritt,* No. 00 Civ. 5712, 2004 WL 1781006, at *5 (S.D.N.Y. Aug. 10, 2004) (*citing Feld* ). In *Feld,* a letter in response to a demand conditioned the return of disputed property on the resolution of other disputes between the parties. The

3. This assumption contradicts certain allegations in the complaint-notably that "Barr clearly knew that Weidler was trying to sell a stolen Grosz to him" when he purchased *Poet* (Compl.¶ 88)—but since plaintiffs could amend their Complaint to remove those assertions (which admit only of the conclusion that MoMA was *not* a bona fide purchaser without notice), I will decide the motion as though the Complaint alleged that the museum took title to all three works in good faith.

4. If (as is actually alleged in the Complaint) MoMA took title to *Poet* in bad faith, then absent any tolling of that limitations period (and there is no basis to toll the statute, *see infra* Part V), plaintiffs' claims to *Poet* have been time barred since 1956—three years after they allege that the museum knowingly acquired wrongful ownership. *See Close–Barzin v. Christie's, Inc.,* 51 A.D.3d 444, 857 N.Y.S.2d 545 (N.Y.App. Div. 1st Dep't 2008).

plaintiff insisted that the letter was not sufficiently definite to constitute "refusal" of his demand; not only did it not use the word "refuse," but it even indicated that there were circumstances under which the property might be returned at some unspecified moment in the future. But the First Department disagreed with this argument. Because the sender retained the disputed property and indicated that he would not return it unless his demands were met, his conduct was inconsistent with a plaintiff's claim of ownership, and so constituted a "refusal," thus causing plaintiff's cause of action to accrue. *Feld*, 279 A.D.2d at 395, 720 N.Y.S.2d 35.

In *Borumand v. Assar*, No. 01 Civ. 6258, 2005 WL 741786 (W.D.N.Y. Mar. 31, 2005), a federal court in New York took the *Feld* doctrine one step further, holding that refusal need not be conveyed in words at all. Rather, the court explained, "Actions may be sufficient to constitute a refusal if they amount to 'an overt and positive act of conversion.'" *Id.* at *14 (citation omitted). In *Borumand,* the defendant "never explicitly informed [plaintiff] that he would not relinquish possession [but] he never in fact turned over the [chattels] and [instead] continually maintained that he would do so at some future time." *Id.* The court ultimately held that the plaintiff's claim accrued one year after her initial demand, since by that time, she should have "reasonably concluded" that the defendant's actions in putting her off amounted to a refusal. *Id.*

 In line with *Feld* and *Borumand.* a court must analyze the actions as well as his words of a person who receives a demand before deciding whether and when it was refused. If either the recipient's words or actions evidences "an intent to interfere with the demander's possession

or use of his property," *see Feld,* 279 A.D.2d at 395, 720 N.Y.S.2d 35—which is an "overt and positive act of conversion," *see Borumand,* 2005 WL 741786, at *14— then the demand has been refused and the cause of action accrues, even if the words "I refuse your demand" were not explicitly used. This conclusion comports with the purpose behind the demand-and-refusal rule, which is to give an innocent purchaser the opportunity to turn over chattel in his possession after learning that it had been stolen from someone else. Nothing in the rule's history or purpose suggests that a party who receives a demand, and who thereafter acts in a manner that is inconsistent with the demander's claim to ownership, should be held not to have "refused" the demand simply because he failed to recite some magic words of rejection. Actions, as we all know, can sometimes speak louder than words.

With this in mind, we examine the dealings between the Grosz Estate and MoMA in the months and years after the demand was made, which occurred in a November 24, 2003 letter from Ralph Jentsch (acting on behalf of the Grosz estate) to MoMA's Director, Glenn Lowry. (*See* Compl. ¶ 117 & Ex. 26.) [5]

 In the twenty-nine months following receipt of that letter, MoMA took a number of actions with respect to the Paintings. It engaged researchers from Yale to look into the Paintings' provenance, met periodically with representatives of the Grosz Estate, and engaged in sporadic correspondence with Jentsch. In January 2006, the museum's Board retained former Attorney General Nicholas de B. Katzenbach to review the work that had been done and to prepare a report and recommendation for the Board. At all

---

**5.** For purposes of the demand and refusal rule, everyone agrees that this letter is the demand.

times while this activity was going on, MoMA retained custody of the artworks.

MoMA argues that it clearly communicated its refusal to return the Paintings in one of its letters to Jentsch—the one dated July 20, 2005—and asks the Court to dismiss this action because plaintiffs' claims had to have accrued no later than that date. (*See* MoMA MTD at 18.)

Plaintiffs argue that the museum did not reject its demand until April 12, 2006 (MTD Opp. at 9), when MoMA sent a letter notifying plaintiffs that its Board of Trustees had voted to accept Katzenbach's conclusion that the museum had no obligation to return, and should not return, *Poet* and *Self–Portrait*.[6] (*See* Solomon Decl. Ex. E (Katzenbach report).)

I conclude that defendant has the better of this argument. If MoMA's failure to return the Paintings for more than a year and a half after plaintiffs demanded them did not constitute a refusal as a matter of law (and this Court thinks that it did), then the July 20, 2005 letter—in which the defendant clearly communicated its intent to keep all three works despite plaintiffs' demand—was an act utterly inconsistent with plaintiffs' claim of right. It thus constituted the sort of refusal contemplated by the demand and refusal rule.

MoMA's Director, Glenn Lowry, began his July 20 letter to Ralph Jentsch as follows: "I enjoyed our recent meeting and continue to appreciate the frank and open dialogue that we have created together in order to deal with the Grosz estate's questions concerning the [Paintings] at the Museum of Modern Art that are under discussion." (Solomon Decl. Ex. A at 1.) But Lowry expressed "concern" about what he believed to be a misunderstanding by Jentsch. Specifically, he wrote:

> I am concerned that we may have a different interpretation over some of what has been said in the last two years about these works and I want to clarify our position in order to avoid—given the importance of the issues under consideration—any confusion. We have, as you know, a fiduciary obligation to our collection. Before we remove a work from the Museum's collection, we need to establish convincing and conclusive evidence that another party—in this instance, the Estate of George Grosz—has ownership rights superior to the Museum's, ... For this reason, I think it is critical to state that I never said—nor could I have said—that MoMA would restitute the Grosz works if no documents could be found contradicting the documentation for your initial restitution claim.

(*Id.*)

Lowry explained the museum's position on *Poet:*

> I think it is fair to say that we have now reached a point where it appears that no more information is currently available for us to consider, a point on which I sense, we both agree. We have, however, reached somewhat different conclusions about the results of our extensive study of the provenance of [*Poet*]: we believe that the available evidence *does not lead to any definitive conclusion that challenges the Museum's ownership of the picture. In fact, much of what we know argues in favor of MoMA's clear title.*

(*Id.* (emphasis added).)

With respect to the other two Paintings (*Self–Portrait* and *Automatons*), Lowry stated: "Although we are aware of the

---

**6.** *Automatons* was not mentioned in the Katzenbach report. In fact, the work is mentioned only in the November 24, 2003 demand letter and in Lowry's July 20, 2005 letter to Jentsch. After that, all mention of *Automatons* ceases. The parties have not explained why, and in view of the Court's conclusion the reason is irrelevant.

restitution of a painting with similar provenance [to *Self–Portrait*], based on the material that you have shared with us, and on our own extensive research—much of which we have done in collaboration with Yale University—*we cannot reach the conclusion that restitution of either this picture [Self–Portrait], or of the drawing, Republican Automaton, would be appropriate at this time."* (Solomon Decl. Ex. A at 2) (emphasis added).

Lowry's statements, especially the highlighted portions thereof, plainly indicate that, as of July 20, 2005, MoMA rejected plaintiffs' assertion that they had an immediate right to possession of the three Grosz works. Lowry plainly asserts that MoMA has superior title to *Poet*, and stated that it "could not conclude" that plaintiffs were entitled to possession of either *Self–Portrait* or *Automaton*. And he stated that the museum intended to keep all three paintings (at least "at this time")—which it did.

Lowry's July 20, 2005 letter, coupled with the museum's continued retention of the works after it was sent, indicates its continuing intent to interfere with the rights asserted by plaintiffs in their demand. This is all the "refusal" the law could possibly require before plaintiffs' causes of action for conversion and replevin (as well as the corresponding equitable claims) accrued. After reading the July 20 letter, no reasonable person could have concluded that MoMA agreed with plaintiffs' assertion that they were the rightful owners of the Paintings, and as such were entitled to immediate possession of them. The only conceivable reading of the letter is that MoMA emphatically disagreed with plaintiff's position—a reading that is supported by its continued retention of the purportedly purloined Paintings, which, as the *Borumand* court ruled, is an "overt and positive act of conversion." *See Borumand,* 2005 WL 741786, at *14. There-

fore, this Court holds that plaintiffs' claims accrued, and the limitations period began to run, on July 20, 2005.

Underscoring this conclusion is the fact that the parties had previously agreed that MoMA would respond to plaintiffs' demand no later than March 2005 (Solomon Decl., Ex. D at 1–2). By the time the July 20, 2005 letter was sent, the museum had already kept the Paintings for three months beyond the date it set for answering the demand—which is itself an "overt and positive act of conversion."

Plaintiffs dispute the conclusion that MoMA had refused their claims on July 20, 2005. They insist that MoMA's July 20 letter does not constitute a sufficiently clear rejection of their claim. They base this argument on Lowry's use of temporizing language elsewhere in his letter. Specifically, with respect to *Poet,* he said:

> In the spirit of friendship and recognition of the limitations on the present state of our knowledge about the provenance of the work, I suggested the possibility of shared ownership of [*Poet* ] at our May 31 meeting. I did this not out of a conviction that the picture was tainted in some way, but because shared ownership would be a gracious, amicable means of addressing the fact that we may never be able to understand fully the work's history in the decades before the Museum purchased it in 1952.
>
> . . . .
>
> I proposed five or ten year benchmarks as opportunities for MoMA and the Grosz Foundation to review their positions and to consider any new information that might come to light. If further research produced conclusive facts, one way or another, either the Foundation or MoMA could withdraw its ownership claims. If no new or conclusive evidence comes to light, the shared arrangement

could continue, more or less in perpetuity.

(*Id.* at 2.) Plaintiffs also note that Lowry invited Grosz family to meet with museum representatives sometime in the "early fall" "to review the facts and determine an appropriate course of action . . . . to best serve[ ] the needs of George Grosz." (*Id.*)

Insofar as plaintiffs interpret these statements as having somehow tempered the museum's clearly stated refusal to return the artworks "at this time," as well as its flat-out rejection of plaintiffs' claims to ownership of *Poet*, their interpretation is misguided. Lowry's temporizing language was almost certainly designed to entice plaintiffs to continue negotiating and to prevent the dispute from becoming public or escalating into litigation. And indeed, throughout the parties' dealings, MoMA indicated a willingness to resume looking into the matter anew if new evidence surfaced—as any responsible museum would. (*See* Solomon Decl. Ex. A at 2 (July 20, 2005 letter from G. Lowry to R. Jentsch); *id.* Ex. E at 1 (April. 12, 2006 letter from G. Lowry to R. Jentsch).)

However, nothing Lowry said contradicts his clearly stated rejection of plaintiffs' demand that the three Paintings be returned to them, the "rightful" owners. The fact that additional research or evidence might someday cause MoMA to alter the conclusions it had obviously reached by July of 2005 is irrelevant to whether plaintiffs' causes of action accrued. Plaintiffs made a demand for return of the works in November 2003. At some point MoMA had to return the Paintings in order to avoid converting them. In the July 20, 2005 letter, it expressly refused to do so. The museum's suggestions about "shared ownership" of *Poet* pending "further research," and future meetings to "review the facts," suggest that perhaps MoMA might one day be open to giving plaintiffs one or more of the works—but

that is no different from the *Feld* defendant's assertion that he would return the stolen property if the parties could resolve their other disputes. The museum's actions and its statements were inconsistent with the demander's claim to ownership of the works.

In sum, MoMA had reached a conclusion after nearly two years of research; its conclusion was inconsistent with plaintiffs' claim of ownership; Lowry, acting on behalf of MoMA, communicated that conclusion to plaintiffs; and the museum kept the Paintings after Lowry sent that message. From and after that moment when Lowry sent the July 20, 2005 letter, plaintiffs were on notice that their demand (which was for immediate possession of the works) had been refused. At that point, their rights of action were fully ripe, and the three year limitations period began to run.

Plaintiffs' contend, in conclusory fashion, that they relied on Lowry's temporizing language to forbear from bringing suit. But two letters written by Jentsch in January 2006—more than three years prior to the commencement of suit on April 12, 2009—make it clear beyond peradventure that Jentsch understood that plaintiffs' demand had been refused. (*See* Solomon Decl. Exs. C & D.)

In the first letter, dated January 5, 2006, Jentsch sought to "memorialize the substance" of a meeting he had previously had with Lowry. According to Jentsch, the purpose of that meeting was "to clarify once and for all MoMA's position with regard to the restitution to the Grosz Estate of two works [*Poet* and *Self–Portrait* ] by George Grosz." (*Id.* Ex. C at 1.) Jentsch wrote: "I presented to you [Lowry] a letter authorized by the George Grosz heirs demanding return of the two works by February 3, 2006. *You rejected the demand and advised that the works*

would not be returned by this date or any date." (*Id.* (emphasis added).)[7]

The second letter, dated January 20, 2006 (*see* Solomon Decl. Ex. D.), is even more compelling evidence that plaintiffs (through their representative) well knew that MoMA had rejected their original demand the summer before. Jentsch not only reiterated his understanding that MoMA was not going to return the Paintings, but acknowledged that MoMA had "outright declined restitution" of the works in Lowry's "letter to me, July 20, 2005." (*Id.* at 2 (emphasis added, errors in original).) Jentsch went on to say, "I responded to you in a letter August 11, 2005, and asked you the question on what basis MoMA would *deny restitution* of the oil 'Maler und Modell' [*Self–Portrait*] . . . ." (*Id.* (emphasis added).) Jentsch's statements in this second letter fully support the court's conclusion that the statute began to run no later than July 20, 2005.

Plaintiffs' claims to all three Paintings are thus time barred under the demand and refusal rule.

## V. Equitable Tolling

■ Anticipating a finding that their claims are stale, plaintiffs suggest that this Court apply the doctrine of equitable tolling to suspend the statute of limitations for the period of "compromise negotiations from 2003 to April 12, 2006." (MTD Opp. at 12.) In support of their argument, plaintiffs cite two cases: *Smith v. McGin-*

nis, 208 F.3d 13 (2d Cir.2000), and *Lord Day & Lord v. Socialist Republic of Vietnam,* 134 F.Supp.2d 549 (S.D.N.Y.2001). In neither of these cases did the court conclude that the limitations period should be equitably tolled, and in any event both are factually inapposite. Insofar as they are at all relevant, these cases establish that equitable tolling "applies only in the 'rare and exceptional circumstance,' " and is appropriately invoked only where a plaintiff has "acted with reasonable diligence throughout the period he seeks to toll." *Smith,* 208 F.3d at 17 (citations and alterations omitted). In other words, the plaintiff must *show* that he has been 'prevented in some extraordinary way from exercising his rights.' *Id.* (internal quotations omitted). This case does not present one of the "rare and exceptional circumstances" in which any tolling of the limitations period would be equitable.

■ Although plaintiffs contend that the entire two and one half year period of negotiations ought to be excluded from the limitations period, they do not explain why this should be so. Instead, plaintiffs argue as follows: "On January 18, 2006, Lowry wrote to the [plaintiffs] telling them to wait and assuring them that MoMA had not refused their claims until the Board considered the Katzenbach report and made their decision. Lowry's January 18, 2006 letter equitably tolls the statute of limitations because the [plaintiffs] reasonably relied on it." (MTD Opp. at 12.) It

---

7. Whatever was said at the referenced meeting to cause Jentsch to write the January 5, 2006 letter, Lowry absolutely refused to countenance plaintiffs' demand for the return of the Paintings by February 3, 2006—which he called their "ultimatum." In a letter dated January 18, 2006, Lowry wrote: "the Museum of Modern Art has determined not to respond to your ultimatum." (Dowd Decl. Ex. 1 at 2). As the Paintings were obviously not conveyed to plaintiffs by February 3, 2006 deadline Jentsch imposed, it is obvious that

this later demand, too, was explicitly rejected by the museum well before April 12, 2006–in any event, no later than February 3, 2006, when the Paintings stayed where the were. If we were to ignore everything that went before, and accept February 3, 2006, as the date of the museum's refusal (of plaintiffs' demand that the Paintings be returned by that date), this lawsuit was still filed more than two months too late. However, that is not the conclusion the Court has reached.

thus appears that plaintiffs are contending that the museum's decision to involve the Board in the matter, and the Board's retention of Katzenbach to review the situation, is the basis for an equitable toll, because it somehow led plaintiffs to believe that MoMA had not yet refused their demand.

This argument is utterly unpersuasive.

First of all, in the January 18 letter to which plaintiffs refer, Lowry did not disavow MoMA's determination to keep the Grosz works in its collection in derogation of plaintiffs' purported rights. On the contrary, he emphasized that the museum—although willing to return works of art in the face of legitimate claims—had no reason to question its conclusion that plaintiffs' claims were unfounded:

> The Museum of Modern Art has demonstrated that it is willing to engage in serious, scholarly provenance research on works in its collection. We have further demonstrated that, where the facts support it, we are willing and able to conclude that a claim is legitimate and that someone else has an ownership right superior to the Museum's .... *No such compelling facts exist in this instance.*

(Dowd Decl. Ex. 1 at 2, emphasis added.) Lowry indicated that the museum's Board had decided to retain Katzenbach "notwithstanding that" (i.e., notwithstanding the fact that there was no compelling evidence to support plaintiffs' claims), but he plainly stated:

> We take this extraordinary step [of asking Katzenbach to review the matter] not out of any sense of uncertainty about our conclusions, or any wavering in our resolve, but rather to obtain an intelligent, candid, independent assessment of the situation.

(*Id.*)

The January 18 letter underscores, rather than undermines, the museum's previously-stated belief that it had superior rights in the works in suit. It suggests no "sense of uncertainty about our conclusions" and no "wavering in our resolve." If I may paraphrase, the January 18 letter says, "We still think we were right—in fact, we have no reason at all to think we were wrong—back on July 20, when we told you we would not give you the Paintings. But because we are the Museum of Modern Art, we are going to ask an outsider to look at the matter yet again." In the context of everything that had gone before, Lowry's statements on January 19, 2006, gave plaintiffs no reasonable basis to conclude that MoMA's July 20, 2005 letter did not constitute a rejection of their original demand—as Jentsch himself recognized in a letter sent to Lowry only two days later.

Furthermore, there is a logical flaw in plaintiffs' argument that the statute ought to be equitably tolled for the entire twenty-nine month period of its interaction with MoMA. Katzenbach's retention did not and could not alter or undo the fact that the museum had refused plaintiffs' demand some six months earlier. Put otherwise, the Board's action did not cause a claim that had accrued 182 days earlier to "unaccrue" and restart the limitations clock at Day One. At best, what plaintiffs can argue is that the Board's decision to commission a report from Katzenbach tolled (suspended) the running of the statute during the period while he did his work—i.e., from January 18 until April 12, 2006—a period of 84 days. Adding 84 days to the limitations period moves the date by which suit had to be brought from July 20, 2008, to October 13, 2008—which is not enough to save plaintiffs' Complaint from dismissal.

Finally, plaintiffs have not established that the circumstances surrounding their lengthy period of inaction "adversely affected [their] capacity to function general-

ly or in relationship to the pursuit of [their] rights." *Pena v. Potter*, 326 Fed. Appx. 33, 35 (2d Cir.2009) (citation omitted). The Second Circuit has explained that a plaintiff must do more than declare that equitable tolling is appropriate in order to establish his right to such relief. *See Boos v. Runyon*, 201 F.3d 178 (2d Cir.2000) (single sentence alleging mental illness insufficient). But in this case, that is all plaintiffs have done. Nothing in Lowry's January 18, 2006 letter or in the Board's retention of Katzenbach prevented the plaintiffs from bringing suit during the period when Katzenbach was reviewing the matter or at any time thereafter. Indeed, by January 18, 2006, litigation was clearly warranted—more than two years had passed since plaintiffs had made their original demand, MoMA still had not returned the Paintings, and it had repeatedly indicated that it would not do so.

Accordingly, this Court declines to apply equitable tolling to suspend the running of the limitations period for the period November 2003 until April 12, 2006.

## CONCLUSION

The defendant's motion to dismiss is granted. The Clerk of the Court is instructed to remove the motion to dismiss (Docket No. 13) from the Court's outstanding motion list, and to enter judgment for defendant dismissing the case.

In view of the disposition of the motion, the pending Objection to the Magistrate Judge's ruling on a discovery dispute (Docket No. 55) is moot.

This constitutes the decision and order of this Court.

## DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION

### INTRODUCTION

On January 6, 2010, this Court granted defendant's motion to dismiss, on the ground that the statute of limitations barred Plaintiffs from maintaining an action in conversion to recover three paintings held by the museum (the defendants-in-rem). *See Grosz v. Museum of Modern Art*, No. 09 Civ. 3706, 772 F.Supp.2d 473, 2010 WL 88003 (S.D.N.Y. Jan. 6, 2010).

On January 19, 2010, Plaintiffs filed a motion to amend their now-dismissed complaint and to supplement the record (docket no. 61).

On January 20, 2010, Plaintiffs filed a motion for reconsideration or reargument (docket no. 64), which they amended on January 21, 2010 (docket no. 66).

By this decision, the Court denies both of Plaintiffs' motions.

### FACTS

Plaintiffs Martin and Lilian Grosz ("Plaintiffs" or "Grosz Heirs") are the son and daughter-in-law of the late German artist George Grosz. They sued the Museum of Modern Art ("MoMA") seeking the return of three artworks currently in MoMA's collection: *Republican Automatons, Portrait of the Poet Max Herrman–Neisse mit Cognakflasche ("Poet")*, and *Self–Portrait with Model ("Self–Portrait")* (collectively, the "Paintings"). On November 24, 2003, Plaintiffs first "demanded return" of the Paintings, via a letter from their authorized agent, Ralph Jentsch, to MoMA. (First Am. Compl., May 29, 2009 ("Compl."), ¶ 117 & Ex. 26.) The record reflects that Jentsch and MoMA exchanged a series of letters—some of them quite heated—and had several meetings between July 20, 2005, and April 12, 2006. (*See* Decl. of L. Solomon, June 4, 2009 ("06/04/2009 Solomon Decl."), Ex. A.) At no time during this process did MoMA acknowledge Plaintiffs' ownership of the Paintings or relinquish custody of them to Plaintiffs.

Plaintiffs waited until April 10, 2009, to commence this action. The statute of limitations in a conversion case is three years. In a case where the defendant did not come into possession of the converted article in bad faith, the three year period begins to run "not upon the stealing or the taking, but upon the defendant's refusal to convey the chattel upon demand." *Menzel v. List,* 49 Misc.2d 300, 304–05, 267 N.Y.S.2d 804 (N.Y.Sup.Ct.1966) (*citing Cohen v. M. Keizer, Inc.,* 246 App.Div. 277, 285 N.Y.S. 488 (1st Dep't 1936)).

Plaintiffs alleged that their action was commenced before the statute of limitations ran because MoMA rejected their demand for return of the Paintings by a letter from MoMA's director, Glenn Lowry, to their agent, Ralph Jentsch, dated April 12, 2006. (Compl. ¶ 31.) Plaintiffs attached to their pleadings their November 24, 2003 demand letter and a portion of MoMA's alleged refusal letter dated April 12, 2006. (*Id.* Exs. 26–27.)

In their Complaint,[1] Plaintiffs acknowledged that there was intervening communication between the parties, and acknowledged that this communication included, *inter alia,* "MoMA's absolute refusal to toll the statute of limitations." (*See, e.g., id.* ¶ 23, 285 N.Y.S. 488). Plaintiffs did not append any of that communication to their Complaint.

On June 4, 2009, MoMA moved to dismiss the amended complaint as barred by the statute of limitations. In support of its motion, MoMA appended portions of that intervening correspondence. The museum argued that this correspondence was "integral" to Plaintiffs' Complaint because it bore on Plaintiffs' allegation that the Museum had not refused its demand until April 12, 2006. (Mem. of Law in Supp. of Mot. to Dismiss, June 4, 2009 ("MTD"), at 18–19.)

Plaintiffs did not object to MoMA's submission of this correspondence. Nor did they dispute MoMA's assertion (later adopted by this Court) that the correspondence between the parties was integral to the Complaint. Instead, Plaintiffs attached yet another letter from the correspondence that, in their view, bore on the issue of demand-and-refusal. (*See* Decl. of R. Dowd, June 25, 2009 ("06/25/2009 Dowd Decl."), Ex. 1 (attaching January 18, 2006 letter).) At no time did Plaintiffs argue that the Court would have to convert the motion to dismiss into one for summary judgment in order to consider any of these documents.

While the motion to dismiss was *sub judice,* the parties engaged in discovery. On October 26, 2009, Plaintiffs sought production of the minutes of certain meetings of MoMA's Board of Trustees. Defendant turned over those minutes within a matter of weeks.

On November 20, 2009, Plaintiffs wrote a letter to this Court, asking permission to "supplement" their opposition to the motion to dismiss with selected minutes from meetings of MoMA's Board of Trustees and Executive Committee that were held between July 26, 2005 and April 11, 2006. (the "Meeting Minutes"). (*See* Decl. of R. Dowd, Nov. 17, 2009 ("11/17/2009 Dowd Decl."), Exs. 1 & 2.) Plaintiffs argued that these Meeting Minutes supported their position that MoMA did not refuse Plaintiffs' demand until April 12, 2006.

MoMA opposed Plaintiffs' request. In a letter dated November 24, 2009, the Museum argued that minutes were not material to the disposition of its motion to dismiss,

---

1. Plaintiffs amended their complaint as of right by filing an amended pleading on May 29, 2009. References in this opinion to the "Complaint" are in fact to the Amended Complaint.

because (unlike the parties' correspondence) they had not been sent to Plaintiffs during Lowry's negotiations with Jentsch, and so could not have affected Plaintiffs' perception about whether and when MoMA rejected their demand for the Paintings.

However, in case the Court agreed to consider Plaintiffs' November 20 submission, MoMA asked that the Court also take into account certain testimony from Ralph Jentsch's deposition, which they attached. The tenor of that testimony (which the Court did not read at the time) will be discussed later in this opinion.

There followed the usual flurry of correspondence back and forth. Plaintiffs sent two letters, one dated November 25, 2009, and one dated December 1, 2009; and MoMA responded in a letter dated December 2. Plaintiffs appended additional questions and answers from Jentsch's deposition testimony to their November 25 letter. And in the December 1 letter, Plaintiffs mentioned the possibility of amending their Complaint yet again. Since Plaintiffs had already used their one amendment as of right, further amendment would have required leave of Court (see Fed. R. Civ. P. 15(a)(2)), but Plaintiffs did not make a motion for leave to amend.

At the time these letters were flying back and forth, the Court had already done considerable work on the motion to dismiss, based solely on the record submitted in June 2009. The Court had reached tentative conclusions and was in the process of drafting an opinion. I had no inclination to start the process over. Furthermore, I recognized that consideration of deposition testimony (which could not possibly have been relied on in drafting the Complaint)—and most likely consideration of the Meeting Minutes—would require me to convert the motion to dismiss into a motion for summary judgment. It was inevitable that the parties would greet

any such announcement with the submission of yet more material in support of their respective arguments. So the Court declined to consider any of the parties' submissions-not the Meeting Minutes, not Jentsch's deposition testimony—and directed the parties to end the battle of correspondence. *See Grosz v. Museum of Modern Art*, No. 09 Civ. 3706, Mem. Endorsement, Dec. 2, 2009 (docket no. 47).

The decision that was already in the works in December 2009 issued on January 6, 2010. *See Grosz v. Museum of Modern Art*, No. 09 Civ. 3706, 772 F.Supp.2d 473, 2010 WL 88003 (S.D.N.Y. Jan. 6, 2010) (the "January 6 Decision"). The Court granted MoMA's motion to dismiss, holding principally that the statute of limitations had begun to run no later than July 20, 2005, when MoMA refused Plaintiffs' demand for purposes of the demand-and-refusal rule. The Court also concluded that the action was barred using various other possible refusal dates, and even allowing for a brief tolling of statute early in 2006. Familiarity with the January 6 Decision is presumed.

### DISCUSSION

#### I. Legal Standard

 To prevail on a motion for reconsideration, the movant must demonstrate "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See Doe v. New York City Dept. of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.1983) (citations omitted). The Court's review "is narrow and applies only to already-considered issues; new arguments and issues are not to be considered." *See Morales v. Quintiles Transnational Corp.*, 25 F.Supp.2d 369, 372 (S.D.N.Y.1998). A motion for reconsideration "is not a substitute for appeal and 'may be granted only where the Court has overlooked matters or controlling deci-

sions which might have materially influenced the earlier decision.'" *See id.* (citations omitted).

Plaintiffs' motion for reconsideration is denied because they have demonstrated none of the three required factors.

### A. There Has Been No Intervening Change of Controlling Law

Plaintiffs point to no intervening change of controlling law on the subject of the statute of limitations for conversion claims, or the demand-and-refusal rule. They do cite a case that was not included in the opposition to the motion to dismiss—*Ball v. Liney,* 3 Sickels 6, 48 N.Y. 6 (N.Y. Ct. App. 1871). But a case decided more than 125 years ago can hardly be considered new law.

In any event, *Ball* supports the Court's conclusion that Plaintiffs' claims are time barred. In *Ball,* the New York Court of Appeals held that a person who had acquired property in good faith would be afforded only a *"brief* period" to investigate a claim that the property had been stolen before his continuing possession of the property would ripen into conversion under the demand-and-refusal rule and the three year statute of limitations would begin to run. 3 Sickels at 12–13. The *Ball* court concluded that even three months was too long to qualify as a "brief period," and specifically stated that it could *"hardly conceive* of a case where the bailee would be justified in detaining property from the real owner, from May 15 to August 6, nearly three months, to inquire into the title." *Id.* at 13 (emphasis added).

This case involves claims to works of art that are alleged to have fallen prey to Nazi looting in the years leading up to World War II. It would hardly be appropriate to measure the "brief period" for looking into the Paintings' ownership in days, or weeks,

or even the few months that were not brief enough for the *Ball* court. Matters of provenance are notoriously complicated, and the circumstances under which the Paintings made their way to MoMA (as alleged by Plaintiffs) made the museum's investigation difficult.

But nothing in *Ball* suggests that the period for investigation allowed by the Court in this case—*twenty months from the date Plaintiffs made their demand—*would qualify as "brief" for the purposes of New York's demand and refusal rule. Moreover, as discussed in the January 6 Decision, the date on which the Court concluded that Plaintiffs' conversion accrued was three months *after* the date by which MoMA agreed to respond, one way or the other, to Plaintiffs' demand. *Grosz v. Museum of Modern Art,* No. 09 Civ. 3706, 772 F.Supp.2d 473, 486–88 & n. 7, 2010 WL 88003, at *12–13 & n. 7 (S.D.N.Y. Jan. 6, 2010).

### B. There Is No New Evidence That Would Affect the Disposition of the Case

Plaintiffs have not submitted any "new evidence" that would alter the Court's original determination.

The purported "new evidence" consists principally of the Meeting Minutes from MoMA's Executive Committee dated April 4, 2006, and MoMA's Board of Trustees dated April 11, 2006. (Mem. of Law in Supp. of Mot. for Recons., Jan. 20, 2010 ("Pls. Br."), at 16.)

Plaintiffs allege that the Meeting Minutes demonstrate that the Museum did not reject their demand until the Board's April 11, 2006 meeting, at which the Board voted to adopt the Report of Nicholas deB. Katzenbach. Katzenbach had concluded that the museum did nothing wrong by refusing to turn the Paintings over to Plaintiffs.[2]

---

**2.** The Court sees no need to rehash everything

that is contained in the original decision, but

However, the Meeting Minutes add nothing substantive to the record that was already before the court in connection with the motion to dismiss. It has *always* been Plaintiffs' position in this lawsuit that "rejection" did not occur until Katzenbach completed his work and the Board affirmed it. Plaintiffs attached to their Complaint the April 12, 2006 letter in which Katzenbach's conclusions, and the Board's decision to adopt his recommendations, were conveyed to Plaintiffs (via Jentsch). So the "new evidence" that Plaintiffs want the Court to consider—the minutes of the meeting at which the decisions memorialized in the April 12 letter were taken—is not "new" at all. The Court has already considered Plaintiffs' argument that the Board's April 11 action triggered the statute of limitations, and that nothing that happened earlier constituted "refusal" as a matter of law. For the reasons discussed exhaustively in the January 6 Decision, I rejected plaintiffs' contention.

Second, I agree with MoMA that internal Museum documents reflecting communications among MoMA's Executive Committee and its Board of Trustees and Minutes of Board meetings—documents that were not shared with Plaintiffs until many months after this lawsuit commenced—have no bearing on when the statute of limitations began to run. In a case governed by the demand-and-refusal rule, the issue is when, by word or deed, MoMA conveyed to Plaintiffs its intent to continue interfering with their asserted right to possession of the disputed property. *That* is the meaning of "refusal." *See Feld v. Feld,* 279 A.D.2d 393, 395, 720

N.Y.S.2d 35 (N.Y.App. Div. 1st Dep't 2001) ("A refusal need not use the specific word 'refuse' so long as it clearly conveys an intent to interfere with the demander's possession or use of his property.") (citation omitted). Documents that the Plaintiffs never saw could not have conveyed *anything* to them, and so are irrelevant.

The Court has held that Plaintiffs should have concluded that the Museum had refused their demand long before the Board voted to affirm the Katzenbach Report on April 11, 2006, based on the Museum's words (Lowry's July 20, 2005 letter to Jentsch) and its deeds (its continued refusal to turn over the Paintings). *Grosz v. Museum of Modern Art,* No. 09 Civ. 3706, 772 F.Supp.2d at 484, 2010 WL 88003, at *9–10 (*discussing Borumand v. Assar*). In fact, as discussed in the January 6 Decision, the museum rejected Plaintiffs' demand over and over again-by keeping the Paintings for years after the demand was made; by sending letters saying "the available evidence does not lead to any definitive conclusion that challenges the Museum's ownership" and "we cannot reach the conclusion that restitution … would be appropriate at this time"; by suggesting shared ownership or arbitration—even by delaying and temporizing (as the museum surely did). An aggrieved owner of property cannot delay the accrual of his cause of action for conversion indefinitely by eliciting multiple rejections from the person who is interfering with his right to possession. And once his claim accrues, the clock does not reset to zero every time the parties reopen the subject of who owns the disputed property.

---

I take this opportunity to remind the reader that, in January 2006, MoMA's Board commissioned former Attorney General Katzenbach to re-examine the work done on the provenance of two of the Paintings (*Self-Portrait* and *Poet*) and to provide his "opinion and recommendations with respect to two

paintings in the Museum's Collection by the artist George Grosz." (06/04/2009 Solomon Decl. Ex. E (Katzenbach Report (cover letter), at 1).) Katzenbach did as asked and submitted a report to the Board on March 22, 2006. The Board voted to adopt the Report on April 11, 2006.

But even if I were to consider the Meeting Minutes that plaintiff submits, they would not save the Complaint from dismissal. The Meeting Minutes tend to confirm, rather than undermine, MoMA's contention that Plaintiffs' claim accrued far earlier than April 12, 2006. For example, the minutes from MoMA's April 11, 2006 Board of Trustees' meeting—the meeting at which the Board adopted the Katzenbach Report—chronicle the history of the museum's interactions with Plaintiffs. They recount that the museum had offered "to 'share' ownership [with Plaintiffs] pending further definitive research" on the Paintings (Letter from R. Dowd to the Court, Nov. 25, 2009 ("11/25/2009 Dowd Decl."), Ex. A at 3), and to "arbitrate and/or mediate" the dispute (*id.; see also id.* Ex. D at 3 (July 26, 2005 minutes).) The January 6 Decision explains why both sharing and arbitrating are inconsistent with Plaintiffs' claim of ownership in the disputed property, and in and of themselves, indicate rejection of the demand that the Paintings be conveyed to Plaintiffs. Additionally, minutes from MoMA's April 4, 2006 Executive Committee meeting state that "the consensus" of the Trustees *on that date*—more than three years before Plaintiffs filed suit—"was that while the Museum would always remain open to studying any new facts that Mr. Jentsch might wish to bring before the Museum, without more, *the Museum would stand with its position rejecting his claims.*" (*Id.* Ex. D at 2 (April 4, 2006 minutes) (emphasis added).) The only fair inference one can draw from that statement is that the Museum had already rejected Plaintiffs' demand by April 4, 2006.

### C. No Manifest Injustice Would Result From Denial of Plaintiffs' Motion

Finally, Plaintiffs have not argued, and this Court cannot conclude, that manifest injustice would result from a denial of their motion for reconsideration.

Plaintiffs suggest in their motion papers that this Court could only have reached its conclusion on the limitations question by failing to "take judicial notice of the fact that Adolph Hitler came to power in March 1933," and by underestimating the significance of the Holocaust. (Pls. Br. at 24.) It may be that Plaintiffs are suggesting that it would work a manifest injustice if the Court were not to reconsider its decision because the circumstances in which Grosz lost his Paintings were themselves unjust. If so, the Court cannot accept the argument.

First, it is obviously not the case that the Court was unaware of the circumstances that led to the loss of Grosz's paintings. Hitler's rise to power and its effect on Grosz's career were documented in the January 6 Decision. *See, e.g., Grosz v. Museum of Modern Art,* No. 09 Civ. 3706, 772 F.Supp.2d at 476, 2010 WL 88003, at *1 (noting that Hitler ascended to Chancellor in 1933); *id.* (". . . the Third Reich branded him [Grosz] an 'enemy of the state'"); *id.* at 477, at 2 ("[T]he three Paintings fell prey to a network of unscrupulous art professionals, who took advantage of the political climate of the time to divest Grosz of his ownership."). However, the Court was confronted with a legal, not a historical, question: how soon after Plaintiffs demanded return of the Paintings in November 2003 did their cause of action for conversion accrue, and the statute of limitations begin to run? The answer to that question is not a function of circumstances in Germany in the 1930s and 1940s, unspeakably vile though they were.

It may be that Plaintiffs are contending (albeit obliquely) that the statute of limitations ought to be waived because Grosz was a victim of the hideous regime

known as the Third Reich. Plaintiffs append several treatises about the loss of art during the period of Nazi domination and the Holocaust to their proposed amended complaint. No such argument was made in opposition to the motion to dismiss—it was not, for example, the basis for Plaintiffs' claim of equitable tolling—so the Court cannot consider it on a motion for reconsideration. But any such suggestion would lack merit. Aside from equitable tolling, New York does not recognize case-by-case exceptions to its statutes of limitations. For the reasons discussed in the January 6 Decision, the record in this case does not support a finding that the statute should be equitably tolled. Furthermore, as discussed in that opinion, even if the equitable tolling argument made by Plaintiffs in opposition to MoMA's motion were accepted, it would not save Plaintiffs' claims from dismissal on limitations grounds. *See id.,* 772 F.Supp.2d at 488–90, 2010 WL 88003, at *14–16.

Accordingly, nothing in the record suggests that manifest injustice would result from a denial of Plaintiffs' motion.

**II. Whether the Court Should Have Converted the Motion to Dismiss to a Motion for Summary Judgment Is Not Properly Considered On A Motion For Reconsideration**

Plaintiffs argue that the Court should reconsider the January 6 Decision because it should not have considered the documents submitted by both sides in connection with the museum's motion to dismiss without converting the motion into one for summary judgment.

As noted above, Plaintiffs did not make this suggestion until after the motion was decided against them. That alone makes it improper for the Court to consider the issue on a motion for reconsideration. *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers &* *Lybrand, LLP,* 322 F.3d 147, 159 (2d Cir. 2003) (argument waived if made for the first time on a motion for reconsideration). However, two things warrant brief discussion.

First, in this Circuit (though not in all circuits), affirmative defenses are routinely considered under Federal Rule Civil Procedure 12(b)(6). *See, e.g., McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (citing cases); see also 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1226 (3d ed. 2004) ("[T]he current trend in the cases is to allow [the statute of limitations defense] to be raised by a motion to dismiss under Rule 12(b)(6) when the defect appears on the face of the complaint."). Plaintiffs clearly understood this. They failed to object to MoMA's submission of the portions of the parties' correspondence that it deemed relevant to the limitations issue; and they submitted additional portions of that correspondence for the Court's consideration as part of their response to defendant's motion.

Second, although courts in this jurisdiction refer to the statute of limitations in the context of the demand-and-refusal rule as an "affirmative defense," *see, e.g., Lehman v. Lehman,* 591 F.Supp. 1523, 1527 (S.D.N.Y.1984), in a cause of action for conversion against a good faith purchaser of chattels, "demand and refusal are substantive elements" of the claim, *DeWeerth v. Baldinger,* 836 F.2d 103, 107 n. 3 (2d Cir.1987) (citing cases), *rev'd on other grounds by Solomon R. Guggenheim Found. v. Lubell,* 153 A.D.2d 143, 550 N.Y.S.2d 618 (1st Dep't 1990); *accord Kunstsammlungen Zu Weimar v. Elicofon,* 678 F.2d 1150, 1161 (2d Cir.1982). Therefore, Plaintiffs were required to plead compliance with the statute of limitations in their complaint, which necessarily rendered the parties' correspondence "in-

tegral" to the complaint. This obviated any need to convert the motion to dismiss to a motion for summary judgment. Of course, when Plaintiffs affirmatively pleaded that they commenced this action within three years of the Museum's denial of Plaintiffs' demand for the Paintings, Plaintiffs attached to their complaint the lone letter that they contend supported this allegation. But Plaintiffs did not thereby restrict the Court to considering only the April 12, 2006 letter.

 A court may consider matters outside the pleading for the purposes of adjudicating a motion to dismiss if those documents are "integral" to a plaintiff's claims-even if the plaintiff fails to append or allude to them to his complaint. As the Second Circuit explained in *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir.1991). *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992), "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim-and that they apparently most wanted to avoid-may not serve as a means of forestalling the district court's decision on the motion." Otherwise, a plaintiff could "evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the [document] to the complaint or to incorporate it by reference." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991) (citations omitted).

Plaintiffs clearly relied on the entire course of correspondence between the parties when they framed their Complaint. By affirmatively pleading that the April 12, 2006 letter was MoMA's "refusal" of their demand, Plaintiffs necessarily represented that those earlier letters did not convey any "refusal." This made the correspondence between the parties "integral" to Plaintiffs' claim of conversion, specifically to the contention in their Complaint that they had complied with the statute of limitations. Plaintiffs could not evade MoMA's statute of limitations argument by ignoring the earlier letter that was unfavorable to their point of view—including especially the July 20, 2005 letter from Lowry to Jentsch that MoMA (and eventually the Court) identified as the Museum's *actual* refusal of Plaintiffs' demand for purposes of the demand-and-refusal rule.[3]

As will be seen in connection with the Court's discussion of Plaintiffs' motion for leave to amend their amended complaint, the Court might have saved itself a lot of work if it had converted the motion last December. In light of the testimony of Plaintiffs' agent, there is absolutely no way Plaintiffs could have raised a genuine issue of material fact that would have saved their claim from dismissal. (*See infra* Part III). But the Court was not required to convert the motion, and plaintiffs are not entitled to reconsideration on that basis.

### III. The Motion To Amend The Complaint Is Denied Because Amendment Would Be Futile

In addition to moving for reconsideration of the prior decision, Plaintiffs have moved for leave to amend their Complaint and to supplement the record. Plaintiffs argue that amendment is required because the so-called "new evidence" discussed above—the Meeting Minutes, in addition

---

**3.** The July 20, 2005 letter was effectively brought to the Court's attention in another way—and by Plaintiffs themselves—when Plaintiffs chose to call the Court's attention to a letter dated January 18, 2006, as support for their argument that the statute of limitations should be equitably tolled. (*See* 06/25/2009 Dowd Decl. Ex. 1 (attaching the January 18 letter).) The January 18 letter refers to earlier correspondence between the parties, leading the Court inexorably back to the letter that proved fatal to Plaintiffs' lawsuit.

to select excerpts from the deposition of Ralph Jentsch, which they first submitted to the Court last November—supports their claim that MoMA did not refuse Plaintiffs' demand until April 12, 2006.

MoMA responds that amendment would be futile, because none of the evidence proffered by Plaintiffs in support of the motion could possibly alter the Court's conclusion that their claims are barred as a matter of law.

MoMA is correct.

■■ Although leave to amend is to be freely granted, courts have discretion to deny an application for leave where amendment would be futile. *See Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 477–78 (2d Cir.1999) (citation omitted). Here, there can be no question that amendment would be futile.

Plaintiffs' motion for leave to amend relies on the same argument that the court has already rejected in connection with their claim of "new evidence:" namely, that the April 11, 2006 Board Minutes and certain other minutes from MoMA's Executive Committee compel the conclusion that the Museum did not really reject their demand until April 12, 2006, when Lowry conveyed the results of the April 11 Board meeting to Jentsch. Both motions are predicated on the assumption that the Court would have denied defendants' motion to dismiss if only the Court had considered the evidence Plaintiffs proffered to it in November 2009. For the reasons discussed at length above, that assumption is simply wrong.

However, in order to decide the motion for reconsideration and the motion for leave to amend, I have had to become familiar with the submissions that I refused to consider last November. Among the evidence submitted to the Court at that time is certain deposition testimony of Ralph Jentsch, Plaintiffs' agent and the person who dealt with MoMA on their behalf. Jentsch's testimony dooms Plaintiffs' contention that their lawsuit was timely brought.

Both sides submitted excerpts from Jentsch's deposition to the court last November. To support their contention that MoMA did not reject Plaintiffs' demand until after the April 11, 2009 Board meeting, Plaintiffs offered the following:

Q: Now, is that true what Mr. Lowry wrote to you that any decision on a matter like this must be considered by the museum's trustees?

. . .

A: Yes, he said that many times to me.

Q: Okay, what did he say to you many times?

A: Well, that any decision about the restitution could not be made by him but only by the museum's trustees.

(11/25/09 Dowd Decl., Ex. B (Jentsch Tr. 295:10–296:3).)

Plaintiffs did *not* send the court the following additional excerpts from Jentsch's deposition—but MoMA did:

Q: Did any representative of MoMA ever agree to transfer any of the three works to you or to the Grosz Estate?

A: That would have—no.

Q: And did you—you said you were puzzled before the May meeting. Were you—were you puzzled after the meeting as well when Mr. Lowry kept saying, "We have a different opinion?"

A: I got suspicious.

Q: *When did you—when did you first reach the conclusion that MoMA was not returning these works of art to you?*

A: *After that letter of Glenn Lowry, which I think was July 20th, August.*

Q: *July 20th of 2005?*

A: *Yes.*

(Letter from L. Solomon to the Court, Nov. 24, 2009 ("11/24/2009 Solomon Decl"), Ex. A (Jentsch Tr. 132:8–133:2) (emphasis added).)

In a second excerpt, Jentsch testified as follows:

Q: What was your understanding of MoMA's position when you got this letter [the July 20, 2005 letter from Glenn Lowry]?

A: My understanding was that MoMA never had the intention to return or accept our claim and that I was dragged along all of the time, that the time frame was extended twice; that, in spite of all the polite exchange, exchanging words, there was no serious intention to return any of the works, nor acknowledge any of the findings of the documentation which I provided being taken seriously.

Q: Did you communicate that to Mr. Lowry?

A: Yes.

Q: When did you do that?

A: In my letter of August 11th.

(*Id.* at Ex. B (Jentsch Tr. 143:11–144:7).)

MoMA argues that the portions of Jentsch's testimony it submitted render any attempt at amendment futile. I agree. Jentsch's own words confirm his understanding that the museum had rejected Plaintiffs' demand for the return of the Paintings well before April 2006. Although Jentsch stated that he believed that MoMA's Trustees would have to make any decision to "restitute" the Paintings, he clearly explained that it was his understanding that the demand had been refused in July 2005, *the very date found by the Court to be the date MoMA unmistakably communicated its refusal to Plaintiffs.* Jentsch's testimony thus underscores the correctness of the Court's original conclusion—as well as its subsidiary finding that Jentsch's January 5, 2006 letter to Lowry acknowledged the museum's rejection of Plaintiffs' demand. *Grosz v. Museum of Modern Art,* No. 09 Civ. 3706, 772 F.Supp.2d at 488–89, 2010 WL 88003, at *14–15 (S.D.N.Y. Jan. 6, 2010).

█ Plaintiffs' argument is, and has always been, that the limitations clock "reset" and began to run all over again when MoMA's Board decided to re-examine the Museum's decision and retained Katzenbach. That, of course, is not the way statutes of limitations work. Once a cause of action accrues, the limitations period begins to run, and it continues to run—regardless of intervening events—unless something tolls it. *Plaintiff affirmatively pleaded that the museum refused to toll the statute of limitations* (Compl. ¶ 23), so once the limitations period started to run it kept on running.

Furthermore, even if the Board's decision to revisit the matter somehow equitably tolled the statute as of January 18—which was Plaintiffs' argument in opposition to the original motion—Plaintiffs still waited too long to bring suit. *See Grosz,* 772 F.Supp.2d at 489, 2010 WL 88003, at *15. Nothing in the proposed amended Complaint cures that defect.

For these reasons, the motion for leave to amend is denied as futile.

### *CONCLUSION*

Plaintiffs' motion for reconsideration (docket no. 66) is denied. Plaintiffs' motion for leave to amend (docket no. 61) is denied. The Clerk of the Court is in-

structed to remove these motions from the Court's outstanding motion list and to close the case.

This constitutes the decision and order of this Court.